## <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| SIERRA CLUB and GULF RESTORATION NETWORK, | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | No. 14-1190 |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) ) | |
| Respondent. | ) ) ) ) | |

## OPPOSITION TO RESPONDENT'S MOTION FOR SUMMARY
## AFFIRMANCE IN PART AND DISMISSAL IN REMAINING PART

Petitioners argue that FERC violated the National Environmental Policy Act when reviewing the Cameron Liquid Natural Gas ("LNG") export projects, primarily by wrongly refusing to acknowledge that the projects would cause increased gas production in the United States. FERC fully considered and rejected this and Petitioners' other arguments on the merits three times: in the final Environmental Impact Statement, the "Order Granting Applications,"[1] and the "Order Denying Rehearing."[2] FERC also addressed Petitioner Sierra Club's presentation of this argument in two prior proceedings.

Rather than defend the substance of that decision, FERC argues that this court is jurisdictionally barred from reaching the merits of these arguments because Petitioners' first request for rehearing was received at 5:00:25 p.m. on July 21, the last day of the rehearing period. FERC contends that this was too late, under the Natural Gas Act's exhaustion-of-remedies requirements. 15 U.S.C. § 717r(a)-(b) (requiring objections to be presented in rehearing request prior to review of order, "within thirty days after the issuance of such order.")

FERC's rules, however, merely provide that documents received "after . . . 5:00 pm" will be treated as filed the following day. They do not address the precise number of seconds at which a filing will be considered "after" 5:00, nor had FERC

---

[1] *Cameron LNG, LLC*, 147 FERC ¶ 61,230 (2014) (Attachment A to FERC Mot.).
[2] *Cameron LNG, LLC*, 148 FERC ¶ 61,237 (2014) (Attachment C to FERC Mot.).

1

ever previously provided Petitioners notice that filings received before 5:01 could be deemed late.

That Petitioners filed their request at 5:00:25 p.m. does not affect this Court's ability to provide review. This Court has jurisdiction to review the merits where Petitioners "met the command of the statute" by filing their request on July 21, *Dayton Power & Light Co. v. Fed. Power Comm'n*, 251 F.2d 875, 877 (D.C. Cir. 1957), especially where Petitioners acted reasonably in the face of FERC's ambiguous rules. *Sam Rayburn Dam Elec. Co-op. v. Fed. Power Comm'n*, 515 F.2d 998, 1007 (D.C. Cir. 1975). And there is no prudential reason to forego review; FERC had the opportunity to, and did, review and answer the merits of Petitioners' claims.

Furthermore, that Petitioners' request arrived at 5:00:25 is not a reason for this Court to affirm FERC's decision – especially without full merits briefing and oral argument. FERC cannot rely on a procedural requirement of which it failed to provide notice; nothing in FERC's rules, regulations, or prior decisions, suggests that a request received at 5:00 – but after 5:00:00 – will be considered to be "after 5:00," and thus untimely. Alternatively, even if FERC could rely on a timing rule that it had not previously announced, FERC's refusal to waive a *de minimis* violation of that requirement was an abuse of discretion. Even if the filing was

2

25seconds late, the delay caused no prejudice, and Petitioners' lack of notice provided reasonable grounds for the delay.

## I.    Standard of Review

FERC's decision under the Natural Gas Act "will be set aside as arbitrary and capricious if it is not the product of reasoned decisionmaking," *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (internal quotations omitted), but "agency action . . . can be upheld only on the basis of a contemporaneous justification by the agency itself, not *post hoc* explanation of counsel," *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860 (D.C. Cir. 2012). FERC's interpretation of the Natural Gas Act's judicial review provisions is not entitled to deference. *City of Bos. v. U.S. Dep't of Hous. & Urban Dev.*, 898 F.2d 828, 831 n.5 (1st Cir. 1990); *Love v. Thomas*, 858 F.2d 1347, 1352 n.9 (9th Cir.1988); *Midland Coal Co. v. Dir., Office of Workers' Comp. Programs*, 149 F.3d 558, 561 (7th Cir. 1998), *overruled on other grounds by Saban v. U.S. Dep't of Labor*, 509 F.3d 376 (7th Cir. 2007). *See also AKM LLC dba Volks Constructors' v. Sec'y of Labor*, 675 F.3d 752, 766 (D.C. Cir. 2012) (Brown, J., concurring) (citing *Love*, 858 F.2d at 1352 n.9).

## II.   There is No Statutory Bar to Review, Because Petitioners "Met the Command of the Statute"

FERC argues that the Natural Gas Act's requirement to seek rehearing within thirty days of a FERC order creates a jurisdictional bar to judicial review.

Mot. at 2-3. This Court has established that under the Natural Gas Act, when a petitioner satisfies the statutory prerequisites to review by filing its rehearing request on the last day of the rehearing period, this Court has authority to provide review. *Dayton Power & Light Co.*, 251 F.2d at 877.

Violation of FERC's regulatory filing requirements can, under some conditions, provide a reasonable grounds for FERC to deny a request for rehearing, such that the denial would withstand review (though that is not the case here, *see* sections III & IV, below). But such a violation does not create a jurisdictional bar preventing judicial review in the first place. Nor does it preclude the application of ordinary equitable and jurisprudential doctrines. *See also EPA v. EME Homer City Generation,* 134 S. Ct. 1584, 1602-03 (2014) (cautioning against "'profligate use' of the term 'jurisdictional,'" and holding that exhaustion provision similar to Natural Gas Act's "does not speak to a court's authority, but only to a party's procedural obligations").[3]

In *Dayton Power & Light*, petitioner Dayton violated Federal Power Commission[4] rules requiring timely submission of an original request together with

---

[3] *EME Homer City* suggests that the Natural Gas Act's rehearing requirements are best viewed as a statutory prerequisite to review, rather than a strict jurisdictional constraint.

[4] The Federal Power Commission is FERC's predecessor in administration of the Natural Gas Act. *See, e.g.*, *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 993 n.1 (D.C. Cir. 1987).

4

fourteen copies.[5] The Commission determined that Dayton therefore had not filed a timely rehearing request. The Court disagreed, holding that despite the Commission's determination that the request was untimely under Commission *rules*, "[s]o far as the command of the *statute* goes, Dayton's application was timely." *Dayton Power & Light Co.*, 251 F.2d at 877 (emphasis added). Thus, Dayton "met the command of the statute" by delivering a rehearing request to the Commission on the last day of the period provided by 15 U.S.C. § 717r(a). *Id.* The Court therefore found that it had authority to provide review, and remanded the case to the Commission, as the Commission had not yet addressed the merits. *Id.*

In the few cases FERC cites, in contrast, the rehearing requests were received four days, *Williston Basin*, 475 F.3d 330, 332-33 (D.C. Cir. 2006), and several months, *Associated Gas Distribs.*, 824 F.2d at 1004-05, after the statutory deadline. Neither case involved only a failure to meet the purported requirements of FERC regulations, rather than those of the statute.

Here, as in *Dayton Power*, Petitioners met the command of the statute. The Natural Gas Act provides that a request for rehearing may be filed "within thirty days" of an order, without further specifying the time for filing. 15 U.S.C. § 717r(a). The statute does not establish any particular hour (much less second) at

---

[5] Dayton had separately mailed the original and those copies, but because of "clerical inadvertence in Dayton's office," this mailing "was sent by 4th class mail" and was not received until four days after the close of the rehearing period. 251 F.2d at 877.

5

which requests must be filed. Indeed, FERC has acknowledged its authority to adopt a rule accepting electronically filed documents until midnight. Filing via the Internet, FERC Order 703, 72 Fed. Reg. 65,659, 65,663 (Nov. 15, 2007) (midnight filings in Part II.E); *cf.* Fed. R. Civ. P. 6(a)(4). FERC determined that Petitioners had not shown facts warranting waiver of FERC Rule 2001(a)(2), which treats documents filed after business hours as having been filed the following day, but FERC has not disputed that this rule, like the rule at issue in *Dayton Power*, is waiveable (that is, non-jurisdictional). *See EME Homer City,* 134 S. Ct. at 1602-3.

### III.   There Is A Complete Record For Review In This Case, And Review Raises No Prudential Concerns.

That Petitioners' request arrived at 5:00:25 does not, moreover, provide a prudential basis to decline judicial review. Declining review would serve no statutory or jurisprudential purpose. Section 717r's "obvious purpose . . . is to afford the Commission the first opportunity to consider*,* and perhaps dissipate, issues which are headed for the courts." *Moreau v. FERC*, 982 F.2d 556, 564 (D.C. Cir. 1993)) (internal quotation and emphasis omitted); *Fed. Power Comm'n v. Colo. Interstate Gas Co.*, 348 U.S. 492, 500-01 (1955) (finding that a purpose of § 717r is to allow FERC to apply its "technical knowledge and experience"). In light of § 717r(b)'s "reasonable ground" exemption to the requirement that issues be previously presented to FERC, this Court has therefore accepted review of issues that FERC had addressed in prior proceedings, but not in the proceeding under

6

appeal, because "the agency has for all practical purposes had an opportunity to pass on the issue sought to be raised." *Ark. Power & Light Co. v. Fed. Power Comm'n*, 517 F.2d 1223, 1237 (D.C. Cir. 1975); *accord Pub. Serv. Co. of N.M. v. FERC*, 857 F.2d 833, 836 (D.C. Cir. 1988), *rehearing en banc denied*, 863 F.2d 1021 (1988). Here, as in these cases, Petitioners had already presented their primary argument, concerning gas production caused by exports, in two prior FERC proceedings in which FERC addressed it on the merits. *Cheniere Creole Trail Pipeline*, 145 FERC ¶ 61,074 PP 8-19 (Oct. 25, 2013) (Attachment A), *Sabine Pass Liquefaction*, 140 FERC ¶ 61,076 PP 8-22 (July 26, 2012) (Attachment B).[6]

Indeed, FERC has addressed and rejected the merits of all of Petitioners' arguments in its denial of rehearing in *this* proceeding. Order Denying Rehearing P 29 ("we nonetheless address the substance of the rehearing request below"). FERC had and exercised the "ability to consider all the issues and arguments at once and in relation to each other" in resolving "the conflicts among the various competing considerations in a particular case." *Moreau*, 982 F.2d at 563 (quoting *Pub. Serv.*

---

[6] Moreover, since Petitioners requested rehearing here, FERC has addressed the merits of this argument in two more denials of rehearing. *Sabine Pass Liquefaction*, 148 FERC ¶ 61,200 PP 7, 12-13 (Sept. 18, 2014) (Attachment C), *Freeport LNG Development*, 149 FERC ¶ 61,119, PP 13-31 (Nov. 13, 2014) (Attachment D). Sierra Club has separately appealed the *Sabine Pass* decision to this court. *Sierra Club v. FERC,* No. 14-1249 (D.C. Cir. filed Nov. 17, 2014). The 60-day period for appeal of FERC's *Freeport* decision is pending.

*Co. of N.M. v. FERC*, 863 F.2d 1021, 1023 (D.C. Cir. 1988) (statement of seven judges concurring in denial of rehearing en banc)). Here, FERC has considered the issues in the context of this specific matter, and the Court has "the benefit of [FERC's] expert view of why it thought the petitioner's arguments failed," *Save Our Sebasticook v. FERC*, 431 F.3d 379, 381-82 (D.C. Cir. 2005) (interpreting 16 U.S.C. § 825*l*(b)).[7]

The timing of Petitioners' rehearing request thus presents neither a statutory nor a prudential bar to this Court's review.

## IV. FERC's Decision Cannot Be Upheld on Procedural Grounds, Because FERC's Rules Do Not Provide Notice That a Document Filed at 5:00:25 Will Be Treated As Filed the Following Day

To the extent that FERC relies on the time of Petitioners' filing as a rationale for its decision, rather than a barrier to judicial review, that Petitioners' request was filed at 5:00:25 does not provide a reasonable basis to uphold FERC's rejection of Petitioners' request. While FERC claims to rely on a rule establishing that 5:00:25 is 'after 5.00,' it never provided the notice required to enforce such a rule. Agencies must provide "fair warning" of what their rules and regulations require. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012). This

---

[7] The requirement to seek rehearing within thirty days also "assures all participants that their claims will be resolved expeditiously," *Moreau*, 982 F.2d at 563 (quoting *Bos. Gas Co. v. FERC,* 575 F.2d 975, 979 (1st Cir. 1978)). But the handful of seconds at issue here offers no threat to expeditious resolution of applicants' claims.

Court has cautioned that the Natural Gas Act's exhaustion provision, in particular, must not be interpreted or applied to bar suit when delay in seeking rehearing is the result of reasonable actions in the face of ambiguity FERC created. *Sam Rayburn Dam Elec. Coop.*, 515 F.2d at 1007; *see also, e.g.*, *La. Pub. Serv. Comm'n v. FERC*, 482 F.3d 510, 517 (D.C. Cir. 2007) (interpreting parallel provision under 16 U.S.C. § 825*l*). Here, FERC's procedural basis for rejecting the request – that it was untimely filed – fails to meet basic notice-and-comment requirements, and cannot be sustained.

FERC rules provide that documents received "after . . . 5:00 pm" will be treated as filed the following day. Petitioners' initial request for rehearing was received at 5:00:25 p.m. None of FERC's rules address time in seconds. Thus, nothing in FERC's rules provided notice that FERC would treat this request, received while the clock read "5:00" and, when rounded to the nearest minute, received at (rather than after) 5:00, as filed "after . . . 5:00."

FERC has explained that its rules provide that "[f]ilings made *after* the Commission's 5:00 pm Eastern time deadline are considered as having been filed on the following day."[8] This practice is rooted in FERC Rule 2001(a)(2), codified at 18 C.F.R. § 385.2001(a)(2), which provides that "[a]ny document received *after*

---

[8] *Notice of Display of Time on Commission's Electronic Filing System*, Docket Nos. RM07-16-000 and RM01-5-000 (June 28, 2010) (emphasis added) (quoted in pertinent part at Order Denying Rehearing P 8).

regular business hours is considered filed on the next regular business day,"
(emphasis added). FERC regulations further provide that FERC "offices . . . are
open . . . to 5:00 p.m.," 18 C.F.R. § 375.101(c). FERC has explained that the effect
of these two regulations is that "5:00PM EST is the filing deadline,"[9] and FERC's
Notice of Display Time on Commission's Electronic Filing System encourages
filing early to avoid "delay[ing] the filing *beyond* the 5:00 pm Eastern time
deadline."[10] FERC now summarizes its rules by stating that "the Commission's
business hours end at 5:00 p.m., and . . . any document received *after that time* is
considered filed on the next regular business day." Mot. at 12-13 (emphasis
added).

　　　FERC provides no textual support for its assertions that the "plain meaning"
of its regulations compels the conclusion that 5:00:25 is 'after 5:00' and that the
regulations are "clear[ and] precise" on this issue. Mot. at 12, 14. A rule stated in
minutes is not 'precise' as to seconds. Indeed, because none of this authority
specifies time in seconds, the most reasonable interpretations of the rules are that
5:00:25 is *not* after "5:00." This Court has explained that where time is specified in
minutes without seconds, "'3:01' actually means 'between 3:01 p.m. and 3:02
p.m.'" *Associated Gas Distribs. v. FERC*, 738 F.2d 1388, 1392 n.5 (D.C. Cir.

---

[9] FERC, *eFiling User Guide*, 1 (2014), *available at* http://www.ferc.gov/docs-filing/efiling-user-guide.pdf (Attachment E).
[10] *Notice of Display Time, supra* note 8 (emphasis added).

1984) (discussing court clerk's time stamp). A document filed while the clock reads "5:00" would therefore be filed at, rather than *after*, 5:00. Another possible interpretation, in light of the rules' silence as to seconds, would be to round to the nearest unit of time that *is* specified in the regulations, *i.e.*, the nearest minute.[11] Under either of these interpretations, Petitioners' rehearing request was timely.

Indeed, while FERC insists Petitioners' filing was tardy, it has yet to explain at what second a filing becomes late, and why. Would a document received at 5:00:00 have been timely? Or does a document need to be received by 4:59:59? By failing to recognize that its rules, rather than being "clear, precise," and "certain[]," Mot. at 13, 14, are ambiguous and imprecise, and by failing to provide an actual interpretation, FERC has not exercised "fair and considered judgment" necessary to justify its decision. *Christopher*, 132 S. Ct. at 2166.

In an analogous context, this Court has held that where FERC's ambiguity prevents a party from having notice of its obligation to seek rehearing by a certain time, so that the party's actions are reasonable in light of the lack of notice, section 717r(a) cannot bar suit. *Sam Rayburn Dam Elec. Coop.*, 515 F.2d at 1007; *La. Pub. Serv. Comm'n*, 482 F.3d at 517 (interpreting parallel provision under 16 U.S.C. § 825*l*). The *Sam Rayburn Dam* line of cases directly concerns ambiguity as to

---

[11] FERC's rules specify the minute at which its offices close; they do not specify the second at which they close. Rounding units of time not specified in the rules (seconds) to units of time that are specified (minutes) in no way raises questions as to whether FERC should round minutes to hours. Mot. at 13.

11

whether an order affected a party's interests, rather than ambiguity as to a party's procedural obligations. But these cases contradict FERC's claim that the (alleged) procedural lapse here was a sufficient basis to deny the request; before FERC can reject a request on procedural grounds it must provide notice of the procedural obligations it seeks to invoke, or demonstrate that Petitioners' interpretation of ambiguous FERC rules was unreasonable.

The statute may give FERC the discretion to select 5:00:59, 5:00:29, 5:00:00, or any similar time as its filing deadline. But FERC is compelled to provide "fair warning" of what its rules require before enforcing those requirements. *Christopher*, 132 S. Ct. at 2167. FERC has not done so here. FERC's procedural grounds for rejecting the request – that it was untimely filed – consequently fails to meet basic notice-and-comment requirements, and cannot be sustained.

## V.    FERC's Refusal to Waive a *De Minimis* Violation of Rule 2001(a)(2) Was An Abuse of Discretion.

FERC does not dispute that, even if Petitioners failed to file within the time required by Rule 2001(a)(2), FERC has authority to waive *de minimis* violations of this rule and thereby accept a document filed after the close of business. Rather, FERC concluded that "[t]o the extent that Sierra Club suggests that we should waive our regulations, it presents no compelling justification for doing so." Order Denying Rehearing P 23. Because the factors actually considered by FERC, as

12

well as all other factors traditionally considered in this type of waiver analysis, all support Petitioners here, FERC abused its discretion in determining that waiver was not required.

FERC has equitable authority to waive this rule. It is not required by the statute and, as a general principle, minor procedural errors should not interfere with adjudication of substantial issues. *See, e.g.*, Fed. R. Civ. P. 6(b)(1)(B), 60(b)(1) (excusing untimely filings and providing relief from judgments for "good cause" or "excusable neglect"), Fed. R. Civ. P. 61 ("[D]isregard all errors and defects that do not affect any party's substantial rights," including "error by . . . a party."); *see also* FERC Rule 214(d)(1), 18 C.F.R. § 385.214(d)(1) (identifying good cause, disruption to the proceeding, and prejudice as factors to consider in allowing motions to intervene out of time). These admonitions express a broadly applicable rule, which extends throughout FERC's administrative practice: "agency power" is "inherent in most statutory schemes[] to overlook circumstances that in context may be considered de minimis." *Ala. Power Co. v. Costle,* 636 F.2d 323, 360 (D.C. Cir. 1979). *See* 11 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 2881 (3d ed. 2014); *see also Sealy v. Shalala*, 871 F.

Supp. 612, 612 (S.D.N.Y. 1994) (citing *Amberg v. FDIC*, 934 F.2d 681 (5th Cir. 1991)) (applying these principles to "[a]dministratively imposed time limits").[12]

Here, all of the factors traditionally considered in these analyses, and all of the factors FERC in fact considered, support waiver. The delay here was less than thirty seconds – plainly *de minimis*. That FERC, in promulgating rules, did not see a need to specify time in seconds further establishes the *de minimis* nature of the few seconds at issue here. FERC did not, however, consider whether the delay here was long enough to be consequential. *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395, 398 (1993) (noting that length of delay is important).

Nor did FERC consider the central circumstances giving rise to the delay: lack of clear notice regarding the deadline FERC now seeks to enforce. A party is not culpable for failing to meet obligations of which it does not have reasonable notice. *Pioneer*, 507 U.S. at 395, 398 (where "dramatic ambiguity" in notice of the deadline is the "reason for delay," this supports finding excusable neglect); *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997) ("[I]naccurate or ineffective notice from a government agency required to provide notice of the

---

[12] FERC's authority to apply general legal principles in administering the Natural Gas Act is further illustrated by Rule 2007, which extends the 30-day rehearing request period when the last day falls on a weekend, holiday, or day when FERC's offices are closed. This rule is consistent with general legal practice, *Dayton Power & Light Co.*, 251 F.2d at 877 n.6, but is not rooted in any statutory authority.

14

limitations period" warrants equitably tolling that period.); *Prizevoits v. Ind. Bell Tel. Co.*, 76 F.3d 132, 134 (7th Cir. 1996) (delay resulting from "plausible misinterpretations of ambiguous rules" indicates excusable neglect). Although FERC asserts that Petitioners did not "allege any extraordinary circumstance . . . that caused the delay" and that Petitioners should have filed farther in advance of the deadline, Mot. at 13, Petitioners cannot be faulted for filing thirty seconds too late[13] if FERC did not provide notice of a rule requiring that filings needed to be received thirty seconds earlier.[14]

A third factor is prejudice caused by the delay. Neither FERC nor any party contended that Petitioners' delay caused prejudice in this proceeding. While FERC asserted that waiving Rule 2001(a)(2) here would prejudice the broader "administrative process" by "compromis[ing]" the "certainty" provided by the rules, the rules are themselves uncertain. Order Denying Rehearing PP 23 – 25. Thus, there is no danger of such prejudice here. "'[P]rejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in

---

[13] Or twenty five or twenty six seconds; FERC has not explained at what second the time expires.

[14] Although no further explanation is required, Petitioners' August 7 rehearing request explained that the rehearing period and filing deadline coincided with the comment period on the Department of Energy's analysis of the environmental impacts of LNG export projects, including the Cameron Projects at issue here. Cameron LNG, FERC Dkt. CP13-25, Request for Rehearing and Answer to Motion to Strike, 8 n.7 (Aug. 7, 2014) (Attachment F).

evidence.'" *In re Enron Corp*., 419 F.3d 115, 131 (2d Cir. 2005) (quoting *In re O'Brien Envtl. Energy Inc*., 188 F.3d 116, 127 (3d Cir. 1999)).

Thus, the two factors FERC identified as its basis for denying Petitioners' request to waive Rule 2001(a)(2)—the reason for Petitioners' delay and prejudice—both support waiver here. Other equitable factors, such as the length of delay, also support Petitioners. Where all factors point in the same direction, there is no room for balancing, and the failure to excuse untimeliness is arbitrary and capricious. *Pioneer*, 507 U.S. at 398.

The two cases FERC cites in discussing waiver of regulations do not support FERC here. *National Science & Technology Network v. FCC*, 397 F.3d 1013, 1014 (D.C. Cir. 2005), concerned waiver of a substantive, rather than procedural, obligation. *Universal City Studios LLLP v. Peters*, 402 F.3d 1238, 1242 (D.C. Cir. 2005), concerned a proceeding very different than the adjudicative, ongoing proceeding at issue here, with a filing received a full day late, notwithstanding both clear, unambiguous agency rules and an existing, explicit, written policy clearly refusing to grant waivers in precisely the circumstances presented by that case.[15]

---

[15] Moreover, *Universal City Studios* principally relied on other cases that, like *National Science & Technology Network*, sought waiver of substantive FCC rules. *Universal City Studios*, 402 F.3d at 1242 (citing *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1181-82 (D.C. Cir. 2003), *Omnipoint Corp. v. FCC*, 213 F.3d 720, 723 (D.C. Cir. 2000), and *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999)).

FERC's rules requiring documents to be filed before the close of business were ambiguous and did not clearly indicate that documents received before 5:01:00 could nonetheless be "after 5:00" and therefore untimely. Treating Petitioners' 5:00:25 filing as timely would not prejudice FERC or any party, and the length of this delay is truly *de minimis*. In these circumstances, failure to excuse Petitioners' delay was an abuse of discretion. *Pioneer,* 507 U.S. at 398, *In re O'Brien Envtl. Energy Inc*., 188 F.3d at 130.

## VI.   Conclusion

Petitioners' rehearing request arrived at 5:00:25 p.m. That does not create a statutory bar to this Court's review; Petitioners met the statutory pre-requisites for judicial review. And it does not provide a prudential reason to decline judicial review; FERC fully considered and responded to the issues Petitioners seek to raise here, in this proceeding as well as in prior proceedings.

That Petitioners' request was received at 5:00:25 p.m. does not, furthermore, provide a reasonable basis to uphold FERC's decision (much less to summarily affirm it without full briefing on the merits and oral argument). FERC provided no prior notice of the rule it would rely on here: that requests received before 5:01:00 could, nevertheless, be considered 'after 5:00,' and thus tardy. And it has provided no reasonable grounds for its refusal to waive Petitioners' *de minimis* violation of that newly announced rule.

17

For all of these reasons, Petitioners request that FERC's motion to dismiss

be denied.


Respectfully submitted on December 5, 2014.

By:          /s/ Nathan Matthews

Nathan Matthews (Cal. Bar No. 264248)
Sierra Club Environmental Law Program
85 Second St., 2d Fl.
San Francisco, CA 94105
Telephone: (415) 977-5695
Fax: (415) 977-5793
nathan.matthews@sierraclub.org

Attorney for Petitioners Sierra Club and Gulf
Restoration Network

18

# ATTACHMENT A

145 FERC ¶ 61,074
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Jon Wellinghoff, Chairman;
                       Philip D. Moeller, John R. Norris,
                       Cheryl A. LaFleur, and Tony Clark.

| | |
|---|---|
| Cheniere Creole Trail Pipeline, L.P. | Docket No.  CP12-351-001 |

ORDER DENYING REHEARING AND STAY

(Issued October 25, 2013)

1.     On February 21, 2013, the Commission authorized Cheniere Creole Trail Pipeline, L.P. (Creole Trail), pursuant to section 7(c) of the Natural Gas Act (NGA), to construct and operate natural gas pipeline, compression, and related facilities in Cameron and Beauregard Parishes, Louisiana.[1]  The proposed facilities will enable Creole Trail to transport natural gas bi-directionally on its pipeline system and deliver domestic gas to the Sabine Pass LNG, L.P. (Sabine Pass) liquefied natural gas (LNG) terminal in Cameron Parish.  On March 25, 2013, Sierra Club timely filed a request for rehearing and stay of the February 21 Order pending a final decision in this proceeding.  As discussed below, this order denies the requests for rehearing and stay.

I.     **Background**

2.     Creole Trail's existing interstate natural gas pipeline system originates at its interconnection with the Sabine Pass LNG terminal in Cameron Parish, Louisiana,[2] and extends approximately 94.8 miles to its terminus at an interconnection with Texas Eastern Transmission Corporation in Beauregard Parish.  Creole Trail also interconnects with Natural Gas Pipeline Company of America, Transcontinental Gas Pipe Line Company, Tennessee Gas Pipeline Company, Florida Gas Transmission Company, Trunkline Gas Company, and Bridgeline Holdings, L.P.

---

[1] *Cheniere Creole Trail Pipeline, L.P.*, 142 FERC ¶ 61,137 (2013) (February 21 Order).

[2] The Sabine Pass LNG terminal is owned by Sabine Pass, which is affiliated with Creole Trail.

Docket No. CP12-351-001                                                              - 2 -

3.      Prior to 2012, Sabine Pass had authorization to use its LNG terminal to import foreign-sourced LNG and to export LNG that had previously been imported into the United States and stored at its terminal in liquid form.[3]  In 2012, the Commission authorized Sabine Pass under section 3 of the NGA to site, construct, and operate facilities at the existing Sabine Pass LNG terminal designed to liquefy domestic natural gas delivered by nearby pipelines, store the LNG in the terminal's storage facilities, and deliver the LNG from the storage tanks into marine vessels for export (Sabine Pass Liquefaction Project).[4]

4.      The February 21 Order authorized Creole Trail to construct and operate a compressor station near Gillis, Louisiana, reconfigure three existing meter and regulating stations, and install approximately 200 feet of pipeline and related facilities.  Creole Trail's proposals were designed to make its pipeline bi-directional to allow for the transportation and delivery of domestic feed gas to the Sabine Pass Liquefaction Project at the Sabine Pass LNG terminal for eventual export.

5.      Sierra Club protested Creole Trail's application and asserted that the Commission is required to consider in an environmental impact statement (EIS) the reasonably foreseeable indirect and cumulative effects and associated environmental impacts of the additional production of natural gas which Sierra Club contends will be induced by the proposal.  The Commission found in the February 21 Order that Creole Trail's proposal was thoroughly analyzed in the environmental assessment (EA) prepared for the project, and no significant direct or indirect impacts were identified.  The Commission further found that any impacts which may result from additional gas production are not "reasonably foreseeable" under the applicable judicial standard or as defined by the CEQ regulations and thus rejected Sierra Club's contention that the effects associated with the additional natural gas production needed to be addressed in the EA.  The Commission concluded that its approval of the project will not constitute a major federal action significantly affecting the quality of the human environment, and, consistent with Council of Environmental Quality (CEQ) regulations, no EIS was required.

_____

[3] *Sabine Pass LNG, L.P.*, 109 FERC ¶ 61,324 (2004); *Sabine Pass LNG, L.P.*, 115 FERC ¶ 61,330 (2006); *Sabine Pass LNG, L.P.*, 127 FERC ¶ 61,200 (2009).

[4] *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.*, 139 FERC ¶ 61,039, *reh'g denied*, 140 FERC ¶ 61,076 (2012) (*Sabine Pass*).  In 2010 and 2011, pursuant to its NGA section 3 authority, DOE Office of Fossil Energy (DOE/FE) issued to Sabine Pass authorizations to export up to 2.2 billion cubic feet per day of domestically produced natural gas by vessel to all Free Trade Agreement and non-Free Trade Agreement nations, finding the potential export of such volumes was not inconsistent with the public interest.  DOE/FE Order Nos. 2822 (2010) and 2961 (2011).

Docket No. CP12-351-001                                                    - 3 -

## II.      Sierra Club's Request for Rehearing

6.     Sierra Club argues that the Commission erred because it:  (1) failed to analyze the project's indirect and/or cumulative effects with regard to inducement of additional gas production and the environmental harms that will result from such production; (2) wrongfully relied on the Louisiana Department of Environmental Quality (Louisiana DEQ) air permitting in lieu of discussing effects of air emissions and alternatives; and (3) failed to prepare an EIS when substantial questions remained about whether impacts of indirect natural gas production and air emissions will significantly affect the environment.

7.      Sierra Club also seeks a stay of the February 21 Order, claiming that it is likely to succeed on the merits, that it will likely suffer irreparable injury absent a stay, and that a stay will not impose an unreasonable burden on Creole Trail.

## III.     Discussion

### A.     Induced Natural Gas Production

8.     Sierra Club argues that the Commission's environmental analysis was deficient because the EA failed to include the project's reasonably foreseeable impact of inducing additional domestic natural gas production.  Sierra Club contends that while the National Environmental Policy Act of 1969 (NEPA) requires that the Commission consider all reasonably foreseeable indirect and cumulative impacts of a project in the course of its environmental review, the Commission misapplied the "reasonably foreseeable" standard in this case.  According to Sierra Club, the Commission wrongfully concluded that because "[t]he project does not depend on additional gas production, and additional gas production may occur for reasons unrelated to the project and over which the Commission has no control,"[5]  induced natural gas production is not a reasonably foreseeable consequence of the project.  Sierra Club contends that "all available studies and evidence indicate that LNG exports will induce additional domestic natural gas production, primarily from unconventional sources such as shale gas,"[6] and that the Commission should have analyzed the effects of this induced production.  Specifically, Sierra Club refers to and relies on data and information from the Energy Information

---

[5] Sierra Club Rehearing Request at 4 (citing the February 21 Order, 142 FERC ¶ 61,137 at P 55).

[6] Sierra Club Rehearing Request at 3.

Docket No. CP12-351-001                                                - 4 -

Administration (EIA)[7] and also references a private study conducted in 2011 by the Deloitte Center for Energy Solutions.[8]

9.     This issue was fully addressed in the February 21 Order,[9] as well as in the order authorizing the construction and operation of facilities to enable the liquefaction for export of domestic natural gas at the existing Sabine Pass LNG terminal.[10]  Sierra Club also notes that this issue had been addressed in *Sabine Pass,* stating that "[al]though FERC recently refused to consider induced production in a similar proceeding, Sierra Club contends that the decision was wrongly decided and is alternatively distinguishable from the instant proceeding, as we explain below."[11]  However, Sierra Club nowhere explains how the Commission's decisions on the induced production issue in these two proceedings are distinguishable, and we believe that they are not.  The issue is one and the same in each proceeding, involving gas transported pursuant to the same export authorization from DOE/FE.  The Commission stands by its determinations, as well as the reasoning in support thereof, in its three previous orders on the issue of whether its environmental analyses of the Sabine Pass Liquefaction Project and of the Creole Trail proposal here should have included the impact of inducing natural gas production.[12]

10.     The CEQ regulations require agencies to consider the environmental effects of their proposed actions, including:  (1) direct effects, which are caused by the action and occur at the same time and place; and (2) indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.[13]

---

[7] Citing EIA's study, *Effect of Increased Natural Gas Exports on Domestic Energy Markets* (EIA Export Study), January 2012, at 6, 10-11.  Sierra Club points to EIA's estimate that "60-70% (on average, 63%) of exported gas will come from new gas production, and that 73% of this gas will come from shale gas production."  *See* Sierra Club Rehearing Request at 5.

[8] *Made in America: The Economic Impact of LNG Exports on Domestic Energy Markets* (Deloitte Report)*, Exhibit 7 to Sierra Club's Protest and Comments.

[9] February 21 Order, 142 FERC ¶ 61,137 at PP 53-59.

[10] *See Sabine Pass,* 139 FERC ¶ 61,039 at PP 94-99, 140 FERC ¶ 61,076 at PP 8-22.

[11] Sierra Club Motion to Intervene Out of Time, Protest, and Comments at 1, n.1.

[12] *See* February 21 Order, 142 FERC ¶ 61,137 at PP 53-59; *Sabine Pass,* 139 FERC ¶ 61,039 at PP 94-99, and 140 FERC ¶ 61,076 at PP 8-22.

[13] *See* 40 C.F.R. § 1508.8 (2013).

Docket No. CP12-351-001                                                        - 5 -

However, as pointed out in the February 21 Order and explained by the court in *City of Shoreacres v. Waterworth*,[14] an impact is "reasonably foreseeable" if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision. The February 21 Order explained that impacts that may result from the production of domestic natural gas induced by the project are not "reasonably foreseeable" under that definition or the CEQ regulations for several reasons, including that the project does not depend on additional gas production, that additional gas production might occur for reasons unrelated to the project and over which the Commission has no control, and that any attempted assessment of the locations and amounts of future production resulting from the project would be speculative given Creole Trail's interconnections with other pipelines.

11.     Sierra Club contends, nonetheless, that since it is generally accepted among "informed observers" that as a broad phenomenon exports of gas will lead to increased production, "still further increases in production are a reasonably foreseeable consequence of the project."[15]  Consequently, asserts Sierra Club, the Commission is required to evaluate the environmental impact that this particular project will have through "reasonable forecasting and speculation"[16] as to the increased production it will engender.  To this end, Sierra Club reasserts that data and information from the EIA Export Study and the Deloitte Report provide sufficient information upon which the Commission could analyze the predictable effects of exporting gas from the Sabine Pass LNG terminal.

12.     The Commission addressed this assertion in both *Sabine Pass* and in the February 21 Order,[17]  explaining that the EIA Export Study was prepared in response to a request from DOE/FE as one input to DOE/FE's assessment of the potential impacts of current and possible future applications to export domestically produced natural gas.  The EIA Export Study is a general economic forecast over twenty-five years with four export demand scenarios, none of which is specific to the Sabine Pass Liquefaction Project to export domestic gas from the Sabine Pass LNG's terminal.  The EIA Export Study cautioned that projections of energy markets over the long term are "highly uncertain and

---

[14] 420 F.3d 440, 453 (5th Cir. 2005).

[15] Sierra Club Rehearing Request at 4.  Sierra Club claims that its "claim is not limited to shale gas production; NEPA requires consideration of all induced gas production, shale or otherwise." Sierra Club Rehearing Request at 5, n.3.

[16] *Id.* at 6, (citing *Scientists' Institute for Public Information v. Atomic Energy Commission*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)) (*Scientists' Institute*).

[17] *See Sabine Pass*, 140 FERC ¶ 61,076 at P 14, and February 21 Order, 142 FERC ¶ 61,137 at PP 57-58.

Docket No. CP12-351-001                                                                    - 6 -

subject to many events that cannot be foreseen, such as supply disruptions, policy changes, and technological breakthroughs."[18]  As we explained in *Sabine Pass*, and reaffirmed in the February 21 Order, the EIA Export Study provides no assistance for us to reasonably estimate how much of the gas transported by Creole Trail's pipeline to Sabine Pass LNG's terminal for export will come from current versus future shale gas production, much less any associated environmental impacts of any new gas production from shale.

13.     The Commission also addressed in the February 21 Order the Deloitte Report's lack of assistance in analyzing the predictable effects of exporting gas from the Sabine Pass LNG terminal.  As stated there, the Deloitte Report focused primarily on the price impacts that exports of LNG may have on the U.S. gas market.  The Deloitte Report also forecasted that the exportation of domestic gas will lead to increased production and that shale gas production particularly in the Marcellus Shale in Appalachia and the Haynesville Shale in Texas and Louisiana, will grow and could eventually become the largest component of domestic gas supply.  However, the Deloitte Report, like the EIA Export Study, did not attempt to identify specific locations where the additional gas production induced by exports will occur or otherwise assist us in reasonably assessing the potential environmental impacts from the production of the gas that would be both induced by the export of domestic gas and transported by Creole Trail's pipeline to the Sabine Pass LNG terminal.

14.     Consequently, the Commission restates, for the same reasons previously articulated, that "the factors necessary for a meaningful analysis of when, where, and how gas development will occur are simply unknown at this time" and that "it is impractical for the Commission to identify and assess impacts associated with the production of additional gas supplies that may be transported by pipelines, including Creole Trail's pipeline, for export from the Sabine Pass LNG's terminal."[19]

15.     In *Sabine Pass* and in its rehearing request of the February 21 Order, Sierra Club relies on *Northern Plains Resource Council v. Surface Transportation Board* (*Northern Plains*)[20] in support of its contention that induced production is a reasonably foreseeable

---

[18] EIA Export Study at 3.

[19] *See* February 21 Order, 142 FERC ¶ 61,137 at P 59.  Sierra Club suggests in its rehearing request that if the Commission found the EIA Export Study inadequate, the Commission should have sought out a facility-specific study.  *See* Sierra Club's Rehearing Request at 6, n.4.  This suggestion ignores the basic obstacle that the Commission stressed in the February 21 Order and the *Sabine Pass* orders addressing this issue:  there is not enough information available to undertake a meaningful analysis of when, where, and how gas development associated with this project will occur.

[20] 668 F.3d 1067 (9th Cir. 2011).

Docket No. CP12-351-001                                                                       - 7 -

effect of the Sabine Pass Liquefaction Project's exportation of domestically produced
natural gas. *Northern Plains* addressed the issue of whether the Surface Transportation
Board should have considered the cumulative impacts of coal bed methane (CBM) well
development as part of its NEPA analysis of a proposed 89-mile-long rail line intended to
serve specific new coal mines in three Montana counties. *Northern Plains* is
distinguishable because, as part of an earlier, programmatic EIS, the Bureau of Land
Management had already analyzed reasonably foreseeable CBM well development which
provided the Surface Transportation Board with information about the timing, scope, and
location of future CBM well development, whereas the Commission has no similar
information in the present case about the timing, location, and scope of future shale (or
conventional) well development which might be associated with the proposed Creole
Trail project. Moreover, as the Commission stated in *Sabine Pass*, *Northern Plains*
establishes that while agencies must engage in reasonable forecasting in considering
cumulative impacts, NEPA does not require an agency to "engage in speculative
analysis" or "to do the impractical, if not enough information is available to permit
meaningful consideration."[21]

16.     Sierra Club in its rehearing request of the February 21 Order, also relies on
*Mid-States Coalition for Progress v. Surface Transportation Board* (*Mid-States*)[22]
to demonstrate the proper application of the "reasonably foreseeable" standard in
circumstances Sierra Club claims to be analogous to those present here. *Mid-States*
involved the Surface Transportation Board's failure, in approving a proposal to construct
280 miles of new railroad and upgrade 600 miles of existing railroad to reach the coal
mines of Wyoming's Powder River, to examine the effects on air quality that a
reasonably foreseeable increase in the supply of low-sulfur coal to power plants would
produce. The court held that the Surface Transportation Board was required under NEPA
to examine the effects that may occur as a result of the reasonably foreseeable increase in
coal consumption, stating that: (1) due to Clean Air Act restrictions, many utilities will
likely shift to the low-sulfur coal such as will be made available by this project; (2) long-
term demand for coal will almost certainly increase as a result of the increased
availability of inexpensive coal that the project will provide; (3) the indirect effect,
specifically, degradation of air quality resulting from the emission of noxious air
pollutants, was identifiable; and (4) parties identified computer models widely used in the
electric power industry that could be used to forecast the effects of the project on coal

---

[21] *See Sabine Pass*, 140 FERC ¶ 61,076 at P 17 (citing *Northern Plains*, 668 F.3d
1067 (9th Cir. 2011). *See also Natural Res. Defense Council v. Callaway*, 524 F.2d 79,
90 (2d Cir. 1975) (holding that an agency need not "consider other projects so far
removed in time or distance from its own that the interrelationship, if any, between them
is unknown or speculative")).

[22] 345 F.3d 520 (8th Cir. 2003).

Docket No. CP12-351-001                                                      - 8 -

consumption.  Critically, the last two findings are absent from the circumstances of the present case.

17.     Here, unlike the circumstances in *Mid-States*, the indirect effect is not identifiable. The court in *Mid-States* found that "when the *nature* of an effect is reasonably foreseeable, but the extent is not, an agency may not simply ignore the effect."[23] However, in this proceeding, the nature of the effect of any induced natural gas production from the proposed project is not "reasonably foreseeable" as contemplated by the CEQ regulations.   Here, it is unknown at this time when, where, and how additional gas development will occur.   As the Commission explained in *Sabine Pass*, it "did not conclude that it was not "reasonably foreseeable" that the Sabine Pass Liquefaction Project would induce increased natural gas production; rather, the order stated that it was virtually impossible to estimate how much, if any, of the export volumes associated with the Sabine Pass Liquefaction Project will come from existing or new shale gas production.[24]  In the same vein, it is virtually impossible to estimate how much, if any, of the export volumes associated with the Sabine Pass Liquefaction Project will come from induced gas production, or the associated environmental impacts of any such production.

18.     In addition, it was not disputed in *Mid-States* that computer programs existed whereby that project's effects on coal consumption could be forecast.  In contrast, as stated above, the Commission finds that neither the EIA Export Study nor the Deloitte Report provide assistance to us in forecasting when, where, and how gas development attributable to exports from the Sabine Pass Liquefaction Project will occur.

19.     For these reasons, the Commission finds that because it is not required to consider impacts from the production of additional gas supplies for export as either direct or indirect impacts of Creole Trail's project, CEQ regulations do not require that the Commission consider such impacts as incremental impacts and consider them as part of the cumulative impact of past, present and reasonably foreseeable future actions by federal and non-federal agencies.  Thus, the EA's consideration of cumulative impacts was appropriately limited to consideration of the incremental impact Creole Trail's construction project could have in the areas where its construction activities will occur.

        **B.     Air Emissions and Alternatives**

20.     Sierra Club contends that the Commission erred by relying on Louisiana DEQ's future permitting process to ensure that the air quality impacts of the project's compressor station are insignificant.  According to Sierra Club, compliance with the Louisiana DEQ's permitting process does not adequately ensure that emissions from the

---

[23]  *Id.* at 549.

[24]  *See Sabine Pass*, 140 FERC ¶ 61,076 at P 9.

Docket No. CP12-351-001                                                    - 9 -

compressor station will be minimized such that they will not exceed acceptable levels. In support of this claim, Sierra Club suggests that the EA acknowledges this by "conclud[ing] that further analysis and modeling is necessary to determine whether the project 'would cause or contribute to a violation of any applicable [national ambient air quality standard] or [prevention of significant deterioration] increment.'"[25]

21.    Air quality impacts are thoroughly considered in the EA,[26] and most of that analysis focuses on the operation impacts on air quality resulting from air emissions from the project's compressor station.[27]    The EA identified several specific federal and state air quality regulations established as a result of the Clean Air Act that potentially apply to the Creole Trail's project.    The EA quantified the project's impact on air quality and presents an analysis of the emissions relative to the relevant permits and programs under the Clean Air Act, including the National Ambient Air Quality Standards (NAAQS), which was specifically established by the Environmental Protection Agency (EPA) to protect human health.    NAAQS for criteria pollutants[28] for the purpose of protecting human health (primary standards) and public welfare (secondary standards), though established by the EPA, are implemented and enforced by the states, in this case by the Louisiana DEQ, through State Implementation Plans.[29]

22.    The February 21 Order requires Creole Trail to document that it has received all necessary authorizations under federal law prior to receiving authorization to commence construction of project facilities, including the requisite air quality permit from the Louisiana DEQ.[30]    The Louisiana DEQ may not issue the permit unless it determines that the project uses the best available control technology (BACT) to reduce emissions and that the project will not cause or contribute to a violation of any applicable NAAQS or Prevention of Significant Deterioration (PSD) increment.    Nonetheless, Sierra Club

_____

[25] Sierra Club Rehearing Request at 9 (citing EA at 24-25).

[26] EA at 18-28.

[27] *Id*. at 21-28.

[28] Criteria pollutants include:  nitrogen dioxide ($NO_2$), carbon dioxide ($CO_2$), ozone ($O_3$), sulfur dioxide ($SO_2$), lead (Pb), particulate matter with an aerodynamic diameter less than or equal to 10 microns, and particulate matter with an aerodynamic diameter less than or equal to 2.5 microns.  *See* EA at 18.

[29] *Id*.  The EA also notes that Louisiana's standards are more stringent than the NAAQS.  Louisiana's standards are found in title 33, part III, chapter 7, section 711 of the Louisiana Administrative Code.

[30] *See* Environmental Condition 9 of the February 21 Order.

Docket No. CP12-351-001                                                      - 10 -

asserts that the project can satisfy the BACT and NAAQS/PSD increment requirements, and still have a significant adverse effect on local air quality; and therefore, the Commission should have analyzed alternative technologies to reduce those effects. The Commission disagrees. As noted above, the NAAQS was specifically established by the EPA to protect human health. Moreover, the EPA is required to periodically review these standards to ensure that they continue to protect human health and the environment.[31] Consequently, the Commission is justified in concluding that Creole Trail's compliance with that permitting process will ensure that the compressor station minimizes air quality impacts to a less than significant level and that analyses of Sierra Club's recommended technology alternatives for Creole Trail's compressor station is not warranted.

        **C.**     **Need for an EIS**

23.    Sierra Club asserts that an EIS should have been prepared because a substantial question exists as to whether impacts of indirect natural gas production and air emissions will significantly affect the environment. As detailed above, the Commission has found that impacts resulting from additional production of natural gas are beyond the necessary scope of its inquiry and that no substantial question relating to the impacts of air emissions from the project exists. Sierra Club also asserts that an EIS is required because the impacts of unconventional gas production, which Sierra Club asserts will be induced by the proposed project, are "highly controversial," and thus, significant.[32] Again, we disagree. Not only are the impacts associated in additional gas production, as they relate to Creole Trail's project, not reasonably foreseeable, but also, for an action to qualify as "highly controversial" for NEPA purposes, there must be a "dispute over the size, nature, or effect of the action, rather than the existence of opposition to it."[33] A controversy does not exist merely because individuals or groups vigorously oppose, or have raised questions about, an action.[34] We do not find that our action here meets the standard of "controversial" so as to require the preparation of an EIS.

---

[31] Any claim that the air quality standards fail to ensure that there are no significant impacts on air quality properly lies with the EPA.

[32] The CEQ regulations provide that the "degree to which the effects on the quality of the human environment are likely to be highly controversial" is one of ten factors relating to the intensity of a project, which in turn is a consideration in determining whether a project significantly affects the quality of the human environment. *See* 40 C.F.R. § 1508.27(b)(4) (2013). Sierra Club raised the very same argument in *Sabine Pass* and the Commission there rejected it. *See* 140 FERC ¶ 61,076 at PP 26-27.

[33] *Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1557 (2d Cir. 1992).

[34] *Id.*

Docket No. CP12-351-001                                                                 - 11 -

**D.** **Stay Request**

24.    Sierra Club requests a stay of the February 21 Order, pending resolution of its rehearing request and any judicial appeal of this order on rehearing.  Since the Commission is now acting on Sierra Club's request for rehearing and there is no pending judicial appeal of this order, its request for a stay is moot.

25.    In any event, the Commission would have denied Sierra Club's stay request, as the Commission has denied rehearing of the same arguments that Sierra Club raises to justify its request for a stay.  When considering stay requests, the Commission considers several factors, including "whether the party requesting the stay will suffer irreparable injury without a stay."[35]  If the party requesting a stay is unable to demonstrate that it will suffer irreparable harm absent a stay, the Commission need not consider the other factors.[36]

26.    Sierra Club asserts that "construction and operation of Creole Trail's proposed facilities will produce irreparable environmental impacts, including impacts of induced production.  As explained in the EA and the February 21 Order, the Commission thoroughly considered the potential environmental effects of Creole Trail's pipeline project, and concluded that, if constructed and operated in accordance with Creole Trail's application, and in compliance with the environmental conditions and mitigation measures set forth in the February 21 Order, the project would not constitute a major federal action significantly affecting the quality of the human environment.  Accordingly, the Commission finds that Sierra Club has not demonstrated that it will suffer irreparable harm, and therefore, the Commission would have denied Sierra Club's stay request.[37]

---

[35] *Devon Power LLC*, 119 FERC ¶ 61,150 (2007).  The other factors are:  whether issuing the stay may substantially harm other parties; and whether a stay is in the public interest.

[36] *Id*.

[37] Sierra Club asserts that the Commission has "frequently" granted motions for stay of orders that would authorize construction prior to resolution of motions for rehearing and judicial appeals.  However, Sierra Club cites only two cases, both of which are inapposite as the project developer either sought the stay or did not object to the stay: *See Horseshoe Bend Hydroelectric Co*., 43 FERC ¶ 61,315 (1988) (hydroelectric licensee sought a stay of construction deadline pending an objecting party's appeal); and *Pacific Power and Light Co.*, 31 FERC ¶ 61,077 (1985) (winning bidder for project did not object to a stay pending the losing bidders' appeal).

Docket No. CP12-351-001                                        - 12 -

<u>The Commission orders</u>:

     (A)    Sierra Club's request for rehearing of the February 21 Order is denied as discussed in the body of this order.

     (B)    Sierra Club's request for a stay of the February 21 Order is dismissed as moot.

By the Commission.

( S E A L )

                         Nathaniel J. Davis, Sr.,
                          Deputy Secretary.

# ATTACHMENT B

140 FERC ¶ 61,076
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Jon Wellinghoff, Chairman;
Philip D. Moeller, John R. Norris,
Cheryl A. LaFleur, and Tony T. Clark.

Sabine Pass Liquefaction, LLC                                Docket No.  CP11-72-001
Sabine Pass LNG, L.P.

ORDER DENYING REHEARING AND STAY

(Issued July 26, 2012)

1.      On April 16, 2012, the Commission issued an order granting Sabine Pass
Liquefaction, LLC and Sabine Pass LNG, L.P. (Sabine Pass), authorization under section
3 of the Natural Gas Act (NGA) and the Commission's regulations[1] to site, construct, and
operate facilities for the liquefaction and export of domestically produced natural gas
(Liquefaction Project) at the existing Sabine Pass Liquefied Natural Gas (LNG) terminal
located in Cameron Parish, Louisiana.[2]  On May 10, 2012, the Chief of Gas Branch 2 of
the Office of Energy Projects issued a letter order approving the start of initial site
preparation.  On May 16, 2012, Sierra Club timely filed a request for rehearing and stay
of both orders pending a final decision in this proceeding (Rehearing Request).  As
discussed below, this order denies rehearing and the request for stay.

I.      **Background**

2.      The April 16 Order approved Sabine Pass's proposal to construct and operate
facilities that would enable the companies to liquefy and export up to 2.2 billion cubic
feet (Bcf) per day of domestically produced natural gas.  These facilities include four
LNG process trains, feed gas metering, flares, refrigerant storage, boil-off gas and water
handling systems, new buildings, and new utility and power generation facilities.
Currently, affiliated Cheniere Creole Trail Pipeline, L.P. and Kinder Morgan Louisiana
Pipeline LLC interconnect with the Sabine Pass LNG terminal, and these near-by
pipelines would construct any facilities necessary to deliver pipeline quality domestic gas
supplies to the Liquefaction Project.  Sabine Pass Liquefaction will acquire gas supplies,

---

[1] 18 C.F.R. Part 153 (2012).

[2] *Sabine Pass Liquefaction, LLC,* 139 FERC ¶ 61,039 (2012) (April 16 Order).

Docket No. CP11-72-001                                                                           - 2 -

arrange for transportation to the liquefaction facilities, liquefy the gas feedstock, store the LNG in the terminal's storage facilities, and deliver LNG from the storage tanks into marine vessels for export.  Sabine Pass Liquefaction will provide new associated services to third parties pursuant to long-term LNG Processing Service Agreements.

3.      The April 16 Order explained that in 1977 the Department of Energy Organization Act transferred the regulatory functions of NGA section 3 to the Secretary of Energy and that, subsequently, with respect to the import or export of natural gas, the Secretary delegated to the Commission the authority to approve or disapprove the construction and operation of facilities, the site at which the facilities would be located, and the place of entry for imports or exit for exports.[3]  The April 16 Order added that the Secretary did not delegate to the Commission the authority to approve or disapprove the import or export of the commodity itself, or to consider as part of the Commission's public interest determination the effect of exporting natural gas on domestic gas prices and supplies available for domestic consumers or energy security.[4]

4.      On September 7, 2010 and May 20, 2011, pursuant to its NGA section 3 authority, DOE Office of Fossil Energy (DOE/FE) issued to Sabine Pass authorizations to export up to 2.2 Bcf per day of domestically produced natural gas by vessel to all Free Trade Agreement and non-Free Trade Agreement nations, finding the potential export of such volumes was not inconsistent with the public interest.[5]

5.      In December 2011, Commission staff issued an environmental assessment (EA) for the proposed Liquefaction Project.  DOE acted as a cooperating agency in the EA process.[6]  The April 16 Order agreed with the EA's conclusion that, with a number of conditions, the siting, construction, and operation of the Liquefaction Project would result in no significant impacts on the quality of the human environment, and that therefore, no Environmental Impact Statement (EIS) was required.

---

[3] Id. P 27.

[4] Id. PP 26, 27.

[5] Id. P 27, *citing* DOE/FE Order Nos. 2833 (2010) and 2961 (2011).

[6] The Council on Environmental Quality regulations implementing NEPA define "cooperating agency" as "any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect" to proposed actions for which a NEPA analysis is prepared.  *See* 40 C.F.R. § 1508.5 (2011).

Docket No. CP11-72-001                                                    - 3 -

6.      As is relevant here, the April 16 Order rejected Sierra Club's assertion that the Liquefaction Project will induce the production of additional natural gas resources found in shale formations throughout the United States, thus requiring the Commission to consider the environmental impacts of such additional production.  The Commission concluded that any potential impacts associated with additional production are not reasonably foreseeable as contemplated by the Council on Environmental Quality (CEQ) regulations implementing NEPA, and therefore were not considered in the EA.[7]  The April 16 Order found that, with the conditions imposed in the order, the Liquefaction Project was not inconsistent with the public interest.

## II.     Request for Rehearing

7.      Sierra Club argues that the Commission was "arbitrary and capricious" in authorizing the Liquefaction Project because it:  (1) failed to consider the Liquefaction Project's reasonably foreseeable indirect effect of inducing additional shale natural gas production and the associated environmental impacts;[8] (2) failed to prepare an Environmental Impact Statement (EIS) that comprehensively considered project impacts to air quality, land and water resources, and greenhouse gas (GHG) emissions, as well as a more thorough analysis of alternatives and mitigation; and (3) erroneously concluded, without adequate environmental analysis, that the Liquefaction Project was not inconsistent with the public interest.  Sierra Club seeks a stay of construction pending Commission and judicial review in this proceeding.

## III.    Discussion

8.      Sierra Club asserts that the EA is deficient because it failed to analyze the project's "indirect effect of inducing natural gas production," and that the Commission erred in concluding that "it was not 'reasonably foreseeable' that exporting 2.2 billion cubic feet of LNG per day…would induce additional natural gas production."[9]  Sierra Club states that NEPA requires agencies to conduct "reasonable forecasting," and that induced natural gas production is indeed reasonably foreseeable, citing to data and

---

[7] April 16 Order, 139 FERC ¶ 61,039 at PP 94-99.

[8] Sierra Club asserts that indirect effects include increased volatile organic compounds, sulfur dioxide, risks to ground and surface water from fracturing, industrialization, and fragmentation of landscapes and habitats from well pads as well as significant greenhouse gas emissions (mainly methane) from induced production and operation of the Liquefaction Project itself.

[9] Rehearing Request at 4.

Docket No. CP11-72-001                                                                - 4 -

information from the Energy Information Administration (EIA).[10]  Sierra Club adds that
the Commission could have provided a rough estimate of the amount of air emissions,
water required, and land associated with the additional production to achieve 2.2 Bcf per
day, or a fraction thereof, of exports as well as the gas consumed at the Liquefaction
Project.[11]

9.       This issue was fully addressed in the April 16 Order, and we find no cause to
revisit the matter in great detail.  We note that in its rehearing request, Sierra Club
misstates the findings set forth in the April 16 Order.  The Commission did not conclude
that it was not "reasonably foreseeable" that the Liquefaction Project would induce
increased natural gas production; rather, the order stated that it is virtually impossible to
estimate how much, if any, of the export volumes associated with the Liquefaction
Project will come from existing or new shale gas production.  Moreover, while it may be
the case that additional shale gas development will result from the Liquefaction Project,
the amount, timing and location of such development activity is simply unknowable at
this time.

10.      The April 16 Order added that an overall increase in nationwide production of
shale gas may occur for a variety of reasons, but the location and subsequent production
activity is unknown, and too speculative to assume based on the interconnected interstate
natural gas pipeline system.[12]  Here, the pipeline interconnects that will provide natural
gas to the Liquefaction Project cross both shale and conventional gas fields.  Specifically,
Sabine Pass will receive natural gas at its interconnection with the Creole Trail Pipeline,
which interconnects with other pipelines in the interstate grid.  These interconnecting
pipeline systems span from Texas to Illinois to Pennsylvania and New Jersey, and cross
multiple shale gas plays, as well as conventional gas plays.[13]  In addition, each of these
interconnecting pipeline systems has a developed network of interconnects with other gas
transmission pipeline companies that may cross additional gas plays.  We also noted that
the Liquefaction Project does not depend on additional shale gas production which may

---

[10] Sierra Club notes that EIA estimates the impact of exporting natural gas on
domestic energy markets, *i.e.*, on average shale gas will provide a 72 percent increase in

domestic gas production.  Rehearing at 6 (*citing* EIA study, *Effect of Increased Natural
Gas Exports on Domestic Energy Markets*, January 2012, at 11).

[11] Rehearing Request at 7.

[12] April 16 Order, 139 FERC ¶ 61,039 at P 98.

[13] Id. P 97.

occur for reasons unrelated to the project, and over which the Commission has no control because it has no jurisdiction over the permitting, siting, construction or operation of natural gas wells.[14]

11.    The Commission recently addressed a similar issue in *Central New York Oil and Gas Company, LLC*, in which we held that the extent and location of future Marcellus Shale wells and the associated development were not reasonably foreseeable with respect to a proposed 39-mile long pipeline located in Pennsylvania, in the heart of Marcellus Shale development.[15]  We found that, while the Pennsylvania Department of Environmental Protection had issued, and was continuing to issue, thousands of Marcellus well permits, it was unknown if, or when, any of these wells will be drilled, much less what the associated infrastructure and related facilities may be for those wells ultimately drilled.  In short, we concluded that the Commission faces too many uncertainties about future well development to assist in our decisionmaking process.

12.    In the instant case, "induced" shale development and its associated impacts are even more attenuated from the Liquefaction Project than in *Central New York.*  In the latter proceeding, the Commission was asked to consider future development which might occur in a relatively confined area:  the Marcellus Shale.  Here, wells which could produce gas that might ultimately flow to the Liquefaction Project might be developed in any of the numerous shale plays that exist in most of the eastern United States.[16]

---

[14] Id. P 98.

[15] *Central New York Oil and Gas Company, LLC*, 137 FERC ¶ 61,121 (2011), *reh'g denied,* 138 FERC ¶ 61,104 (2012), *aff'd, Coalition for Responsible Growth and Resource Conservation, et al. v. FERC,* No. 12-566, 2012 U.S. App. LEXIS 11847 (2nd Cir. June 12, 2012) (*Central New York*).

[16] April 16 Order, 139 FERC ¶ 61,039 at P 97.  While Sabine Pass's application stated that the Liquefaction Project will support increased shale production, no specific shale play is identified.  Moreover, Sierra Club repeats on rehearing that the EA's statement of the purpose of the export terminal is that it will "allow further development of unconventional (particularly shale gas-bearing formation) sources in the United States."  Rehearing Request at 5.  However, as stated in the April 16 Order—with no rebuttal from Sierra Club—the cited EA language is a restatement of purpose and need as articulated by Sabine Pass; the EA addressed the proposal to construct and operate facilities to add liquefaction capability for domestic natural gas supplies at an existing LNG terminal.  *See* April 16 Order, 139 FERC ¶ 61,039 at P 47.

Docket No. CP11-72-001                                                                                                    - 6 -

13.     Even if the Commission was able to confidently state that the Liquefaction Project
will induce shale development in a particular area, the April 16 Order is clear that any
*impacts* which may result from future shale development are not "reasonably
foreseeable" as defined by the CEQ regulations.  As in *Central New York,* the location,
scope and timing of future wells that may ultimately be drilled, and the associated
development (such as well pads, roads and other infrastructure) are unknowable at this
time.  Accordingly, we are not in a position to provide a meaningful analysis of the
potential environmental impacts of such development.[17]

14.     Sierra Club's reliance on the EIA report is misplaced.  EIA prepared its report in
response to a request from DOE/FE as one input to DOE/FE's assessment of the potential
impact of current and possible applications to export domestically produced natural gas.
The EIA report is a general economic forecast over twenty-five years with four export
demand scenarios, none of which is specific to the Liquefaction Project.  The report
cautions that projections of energy markets over the long term are "highly uncertain and
subject to many events that cannot be foreseen, such as supply disruptions, policy
changes, and technological breakthroughs."[18]  Accordingly, the report does not assist the
Commission in reasonably estimating how much of the Liquefaction Project's export
volumes will come from current versus future shale gas production, or where and when
that future production to supply export volumes to the Liquefaction Project may be
located, much less any associated environmental impacts of such new shale production.[19]

15.     Sierra Club's reliance on *Northern Plains Resource Council v. Surface
Transportation Board*[20] as support for its contention that induced gas production is a
reasonably foreseeable effect of the Liquefaction Project is also misplaced.  In *Northern
Plains*, the court held that the Surface Transportation Board should have considered the
cumulative impacts of coal bed methane (CBM) well development as part of its NEPA
analysis of a proposed 89-mile rail line intended to serve specific new coal mines in three

---

[17] As we noted in the April 16 Order, CEQ guidance to agencies provides that "it
is not practical to analyze the cumulative effects of an action on the universe; the list of
environmental effects must focus on those that are truly meaningful." *See Considering
Cumulative Effects Under the National Environmental Policy Act* (CEQ 1997, at 8,
Table 1-2).

[18] EIA Report at 3.

[19] April 16 Order, 139 FERC ¶ 61,039 at P 98.

[20] *Northern Plains Resource Council v. Surface Transportation Board,* 668 F.3d
1067, 1081 (9th Cir. 2011) (*Northern Plains*).

counties in Montana.  However, in that case the Bureau of Land Management (BLM) had already analyzed reasonably foreseeable CBM well development in the vicinity of the proposed rail line as part of an earlier, programmatic EIS that evaluated the impacts of CBM development in the Powder River Basin.  The EIS identified the number of CBM wells that were reasonably foreseeable over the next 20 years, and projected the number of field compressors, miles of gathering lines, and other facilities needed to support the wells, including information on wells and facilities to be located in the three counties the railroad would cross.

16.     Unlike the situation presented in *Northern Plains,* the Commission has no similar information about the timing, location and scope of future shale well development associated with the Liquefaction Project.  Significantly, the *Northern Plains* court pointed out that the Surface Transportation Board was aware that future coal mine development in the project area was imminent because the Board relied on such development to justify the financial soundness of the proposed rail line.  Here, as noted above, it is unknown how much, if any, new shale gas production the Liquefaction Project will rely on for its export volumes, much less the location or timing of such production.

17.     While Sierra Club correctly notes that NEPA requires agencies to engage in "reasonable forecasting,"[21] the *Northern Plains* case establishes that while agencies must engage in reasonable forecasting in considering cumulative impacts, NEPA does not require an agency to "engage in speculative analysis" or "to do the impractical, if not enough information is available to permit meaningful consideration."[22]

18.     Sierra Club also challenges the Commission's determination that induced shale gas production is too speculative for a NEPA analysis by noting that the Commission "imposed a higher standard of proof on environmental concerns than FERC and DOE/FE impose on their analyses of purported economic benefits."[23]  Sierra Club asserts that this conflicts with *Scientists' Institute for Public Information, Inc. v. Atomic Energy*

---

[21] Rehearing Request at 4, citing *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

[22] *Northern Plains,* 668 F.3d 1067 (9th Cir. 2011).  *See also Natural Res. Defense Council v. Callaway*, 524 F.2d 79, 90 (2d Cir. 1975) (holding that an agency need not "consider other projects so far removed in time or distance from its own that the interrelationship, if any, between them is unknown or speculative").

[23] Rehearing at 6.

Docket No. CP11-72-001                                                          - 8 -

*Commission* (AEC) which it argues prohibits an agency from using "one standard of proof in assessing a project's benefits and another in assessing its costs."[24]

19.    Although Sierra Club's argument is not entirely clear, it would appear that it challenges the fact that the economic benefits of increased natural gas production was included in DOE's NGA section 3 public interest analysis authorizing the Sabine Pass export, but that the environmental impacts of the increased production were not similarly considered in the NEPA analysis.

20.    Sierra Club conflates two different statutory obligations:  under NEPA, agencies are required to consider, among other things, the "reasonably foreseeable" environmental impacts of a proposed project in determining whether the project will have a "major significant impact on the quality of the human environment."  Under NGA section 3, agencies must determine whether the requested authorization would be inconsistent with the public interest.  Thus, DOE may well have quantified the overall economic benefits of additional shale gas production for purposes of meeting its separate NGA section 3 public interest finding, notwithstanding the fact that the environmental impacts of additional gas production cannot be similarly quantified because the impacts are not reasonably foreseeable.[25]

21.    In any event, Sierra Club's reliance on *Scientists' Institute for Public Information, Inc.* is unavailing.  There, the D.C. Circuit faulted the Atomic Energy Commission for failing to prepare *any* NEPA analysis for its proposed liquid metal fast breeder reactor program.  The court noted that, while the Atomic Energy Commission had prepared a complex cost/benefit analysis in attempting to justify the proposed program, it failed to attempt to include a consideration of the environmental costs and benefits associated with the proposed program.

22.    Unlike the Atomic Energy Commission, staff prepared a NEPA analysis that thoroughly considered the potential environmental impacts of the Liquefaction Project which informed our decision that the construction and operation of the Liquefaction Project is not inconsistent with the public interest.  Moreover, the D.C. Circuit was persuaded that a NEPA analysis should have been prepared because the Atomic Energy

---

[24] *Id.*, citing *Scientists' Institute for Public Information, Inc.,* 481 F.2d 1079 (D.C. Cir. 1973).

[25] As explained earlier, the Secretary of DOE, not the Commission, has the authority to approve or disapprove the import or export of the LNG commodity itself; accordingly, to the extent Sierra Club raises concerns over DOE's section 3 public interest finding, the Commission must decline to address them.

Docket No. CP11-72-001                                                      - 9 -

Commission had existing detailed estimates on the amount of waste, the amount of land area necessary for storage of the waste, as well as "much information on alternatives to the program and their environmental effects."  Here, the Commission has no existing detailed or quantifiable information with respect to induced shale production that would assist us in a meaningful analysis.[26]

### Need for an EIS

23.    Sierra Club asserts that an EIS should have been prepared for the Liquefaction Project based on the project's "significant impacts," including impacts from additional natural gas production and greenhouse gas emissions resulting from induced natural gas production.  As discussed at length here and in the April 16 Order, we find that the Commission is not required to consider the impacts of induced natural gas production, and need not address this argument.

24.    We also reject Sierra Club's assertion that the Liquefaction Project itself will have "significant" GHG emissions impacts, thus necessitating preparation of an EIS.  Sierra Club argues that the project will emit GHGs at a level much higher than the level at which CEQ, in its draft guidance on NEPA and GHG emissions, advises agencies to consider GHGs.  Sierra Club asserts that, "at the very least, the magnitude of these emissions…raises a substantial question as to whether these emissions will have a significant impact."[27]

25.    CEQ's draft guidance makes clear that its suggested triggering level for considering GHG emissions in a NEPA analysis is not an indicator of "significance" for NEPA purposes; rather, it is an indicator that a quantitative or qualitative analysis of GHG emissions may be meaningful to decisionmakers.[28]  To that end, the EA quantifies the project's contribution to GHGs,[29] analyzes the climate change issues associated with

---

[26] Sierra Club also argues that additional shale gas development attributable to the Liquefaction Project is not speculative, because another nearby LNG export application "predicts" that increased gas will occur in the Eagle Ford, Barnett, and Haynesville Shales.  Rehearing Request at 6.  We will not rely on supply predictions from another company's export application for a different proposal at a different location under different circumstances.

[27] Rehearing Request at 10.

[28] CEQ *Draft NEPA Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions* (February 18, 2010).

[29] EA at Section 2.7.

Docket No. CP11-72-001                                                                   - 10 -

construction and operation of the project, and alternatives for minimizing GHG emissions.[30]  The EA also identifies mitigation measures to reduce GHG emissions, including the selection of turbines which have a better thermal efficiency and reduced $CO_2$ emissions, all of which Sabine Pass must comply with.

26.     Sierra Club also argues that the Liquefaction Project is "highly controversial," thus requiring preparation of an EIS.[31]  Sierra Club asserts that the impacts of LNG export are "plainly highly controversial" in that "there is dispute as to the magnitude of their effects."[32]

27.     For an action to qualify as "highly controversial" for NEPA purposes, there must be a "dispute over the size, nature or effect of the action, rather than the existence of opposition to it."[33]  Accordingly, a controversy does not exist merely because individuals or groups vigorously oppose, or have raised questions about, an action.[34]

28.     Sierra Club appears to seek a much broader, nationwide review of the costs and benefits of LNG export and its impacts.  As an example, it asserts that "FERC and DOE/FE must consider alternatives to the proposal which would better serve the public interest, broadly analyzing other approaches to structuring LNG exports and gas use

---

[30] EA at 98-100.

[31] The CEQ regulations provide that the degree to which the effects on the quality of the human environment are likely to be highly controversial is one of ten factors relating to the intensity of the project that determines whether a project *significantly* affects the quality of the human environment.  *See* 40 C.F.R. § 1508.27(b)(4) (2011).

[32] Sierra Club cites to:  an undated report of the U.S. House of Representatives Committee on Natural Resources on *Drill Here Sell There Pay More, the Painful Price of Exporting Natural Gas;* a DOE letter to Congressman Edward Markey concerning regulation of gas exports (dated February 24, 2012); copies of Congressman Markey's legislation, H.R. 4024 (suspension of approvals of LNG export terminals) and 4025 (prohibiting export of gas produced on leases on federal lands); News articles, "LNG: Prospect of Export Boom Vexes Both Political Parties, but in Different Ways" (May 15, 2012), "LNG Export? Whoever Would Have Guessed" (April 18, 2012); and Politico, "Mixed Response to Sabine Pass" (April 23, 2012).

[33] *Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1557 (2d Cir. 1992).

[34] *Id.*

generally, given exports' sweeping effects on the economy."[35]  This expansive policy
proposal is not before the Commission.  What is before us is the Liquefaction Project,
which will be located entirely within the footprint of the previously approved and
currently operating Sabine Pass LNG terminal site.  As a result, the project's
environmental impacts are relatively small in number and well-defined.  The fact that
Sierra Club disputes the Commission's finding that it cannot, nor is it required to,
undertake a comprehensive analysis of LNG exports and their associated potential
environment impacts, does not amount to a "controversy" requiring the preparation of an
EIS.

### Public Interest Determination

29.    Sierra Club challenges the April 16 Order's finding that the project is not
inconsistent with the public interest.  Sierra Club asserts that the Commission cannot
reach such a conclusion until it has completed an adequate NEPA review which includes
a thorough consideration of the impacts of induced shale production.

30.    We disagree.  For reasons explained here and in the April 16 Order, the EA did not
consider the impacts of induced shale production.  The EA's thorough analysis of the
potential impacts to geology, soils, water resources, wetlands, vegetation, fisheries,
wildlife, threatened and endangered species, land use, recreation, visual resources,
socioeconomics, cultural resources, air quality, noise, reliability and safety, and climate
change, as well as the conditions and mitigation measures set forth in the April 16 Order,
indicate that the Liquefaction Project will not have a significant impact on the quality of
the human environment.  Accordingly, and for all of the reasons set forth in the April 16
Order, we affirm our finding that the Liquefaction Project is not inconsistent with the
public interest.

### Alternatives Analysis

31.    Sierra Club contends that, as lead agency, the Commission must ensure that the
December 2011 EA satisfies DOE's NEPA obligations, including what Sierra Club
argues is DOE's requirement to consider inducement of gas production.[36]  Sierra Club
argues that, whether or not the EA's consideration of the "no action," "alternative energy
source," and "alternative [export] system" alternatives is adequate for the siting and
construction of the Liquefaction Project, the alternatives analysis is "not sufficient for

---

[35] Rehearing Request at 12.

[36] Rehearing Request at 4.

Docket No. CP11-72-001                                                            - 12 -

DOE/FE's purposes."[37]  Sierra Club adds that as the lead agency, the Commission "must prepare an EIA [sic] that allows DOE/FE to consider a wide range of alternatives that relate specifically to its broad public interest mandate."[38]

32.     As noted above, DOE has separate statutory responsibilities with respect to authorizing the export of LNG from Sabine Pass; thus, it has an independent legal obligation to comply with NEPA.[39]  As also noted, DOE participated as a cooperating agency in the Commission's environmental assessment.  DOE has conditioned its authorization for Sabine Pass to export natural gas to non-Free Trade Agreement nations "on issuance by DOE/FE of a finding of no significant impact or a record of decision pursuant to NEPA."[40]

        **Request for Stay**

33.     Sierra Club requests a stay of the April 16 Order and the May 10, 2012 letter order authorizing initial site preparation pending resolution of its rehearing request and any judicial appeal of this order on rehearing.  Since we are now acting on rehearing and there is no pending judicial appeal of this order, we will dismiss as moot Sierra Club's request for a stay.

---

[37] Rehearing Request at 13.

[38] *Id*.  Sierra Club sets forth, "at a minimum," seven alternatives that "must be considered," including:  whether to deny export proposals altogether; whether to delay, deny, or condition exports based upon their effect on the U.S. utility market; and whether, consistent with the EIA study, exports, if allowed, should move forward in smaller quantities or a slower time table.  We note that, although Sierra Club provided input throughout this proceeding, it proffers these alternatives for the first time on rehearing.

[39] *See* 40 C.F.R. § 1506.3 (2011).  *See also CEQ Forty Most Asked Questions Concerning CEQ's NEPA Regulations, Q. 30*, 46 Fed. Reg. 18,026 (March 23, 1981) (a cooperating agency with jurisdiction by law has an independent legal obligation to comply with NEPA).

[40] *See* Ordering Paragraph (F) of DOE/FE Order No. 2961 for exports to Non-Free Trade Agreement Nations, which provides:

        The authorization granted in this Order is conditioned on the satisfactory completion of that environmental review process in FERC Docket No. PF10-24-000 [CP11-72-000] and on issuance by DOE/FE of a finding of no significant impact or a record of decision pursuant to NEPA.

Docket No. CP11-72-001                                                    - 13 -

34.    In any event, we would have denied Sierra Club's stay request, as the Commission is denying rehearing of the same arguments that Sierra Club raises to justify its request for a stay.  When considering stay requests, the Commission considers several factors, including "whether the party requesting the stay will suffer irreparable injury without a stay."[41]  If the party requesting a stay is unable to demonstrate that it will suffer irreparable harm absent a stay, the Commission need not consider the other factors.[42]

35.    Sierra Club asserts that construction and operation of the Liquefaction Project will "produce irreparable environmental impacts," including impacts of induced shale gas production.[43]  As explained in the EA and the April 16 Order, the Commission thoroughly considered the potential environmental effects of the Liquefaction Project, and concluded that, if constructed and operated in accordance with Sabine Pass's application, and in compliance with the environmental conditions and mitigation measures set forth in the April 16 Order, the project would not constitute a major federal action significantly affecting the quality of the human environment.  Accordingly, we find that Sierra Club has not demonstrated that it will suffer irreparable harm, and therefore, we would have denied its stay request.[44]

The Commission orders:

       (A)    Sierra Club's request for rehearing of the April 16, 2012 and May 10, 2012 orders is denied as discussed in the body of this order.

---

[41] *Devon Power LLC*, 119 FERC ¶ 61,150 (2007).  The other factors are:  whether issuing the stay may substantially harm other parties; and whether a stay is in the public interest.

[42] *Id*.

[43] Rehearing at 16-17.

[44] Sierra Club asserts that the Commission has "frequently" granted motions for stay of orders that would authorize construction prior to resolution of motions for rehearing and judicial appeals.  However, Sierra Club cites only two cases, both of which are inapposite as the project developer either sought the stay or did not object to the stay: *See Horseshoe Bend Hydroelectric Co.,* 43 FERC ¶ 61,315 (1988) (hydroelectric licensee sought a stay of construction deadline pending an objecting parties' appeal); and *Pacific Power and Light Co.,* 31 FERC ¶ 61,077 (1985) (winning bidder for project did not object to a stay pending the losing bidders' appeal).

Docket No. CP11-72-001                                                                           - 14 -

        (B)      Sierra Club's request for a stay of the April 16, 2012 and May 10, 2012
orders is dismissed as moot.

By the Commission.

( S E A L )



                                        Kimberly D. Bose,
                                        Secretary.

# ATTACHMENT C

148 FERC ¶ 61,200
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Cheryl A. LaFleur, Chairman;
                        Philip D. Moeller, Tony Clark,
                        and Norman C. Bay.


Sabine Pass Liquefaction, LLC                        Docket No.  CP14-12-001
Sabine Pass LNG, L.P.


ORDER DENYING REHEARING

(Issued September 18, 2014)

1.      On March 24, 2014, Sierra Club filed a timely request for rehearing of the order
issued in *Sabine Pass Liquefaction*, *LLC*, 146 FERC ¶ 61,117 (2014) (February 20
Order).  The February 20 Order amended a 2012 Order that authorized Sabine Pass LNG,
L.P. (Sabine Pass) to site, construct, and operate facilities for the liquefaction and export
of domestically-produced natural gas at the existing Sabine Pass Liquefied Natural Gas
(LNG) terminal in Cameron Parish, Louisiana (Liquefaction Project).[1]  Specifically, the
February 20 Order approved Sabine Pass's requested increase in the Liquefaction
Project's authorized maximum peak day LNG production capacity to reflect the
previously-authorized facilities' capabilities under optimal operating conditions.  For the
reasons discussed below, the Commission will deny Sierra Club's request for rehearing.

I.     **Background**

2.      Sabine Pass operates an LNG terminal in Cameron Parish, Louisiana, which was
authorized in 2004 under section 3 of the Natural Gas Act (NGA) to import foreign-
sourced LNG.[2]  In 2009, Sabine Pass was authorized to use the terminal facilities to
export LNG that had previously been imported and stored at the terminal.[3]  In 2012, the
Commission authorized Sabine Pass to site, construct, and operate facilities at its existing
LNG terminal to liquefy domestic natural gas delivered by nearby pipelines, store the

---

[1] *Sabine Pass LNG, L.P.*, 139 FERC ¶ 61,039 (2012) (2012 Order), *reh'g denied,*
140 FERC ¶ 61,076 (2012) (2012 Rehearing Order).

[2] *Sabine Pass LNG, L.P.*, 109 FERC ¶ 61,324 (2004).

[3] *Sabine Pass LNG, L.P.*, 127 FERC ¶ 61,200 (2009).

LNG in the terminal's storage facilities, and deliver the LNG from the storage tanks into marine vessels for export, i.e., the Liquefaction Project. As relevant here, the 2012 Order authorized the construction and operation of four LNG process trains in two stages (Trains 1 and 2 in Stage 1 and Trains 3 and 4 in Stage 2) with a total LNG production capacity of 16 million tons per year (mtpa), or 2.2 billion cubic feet (Bcf) per day. In August 2013, the Commission amended the 2012 Order to authorize certain facility modifications (Modification Project) to the Liquefaction Project.[4] Commission staff issued environmental assessments (EAs) for the Liquefaction and Modification Projects on December 28, 2011(Liquefaction Project EA) and April, 24, 2013 (Modification Project EA), respectively.[5] The Liquefaction Project is currently under construction.

3.      On October 25, 2013, Sabine Pass filed an application to amend the previously-issued authorization for the Liquefaction Project, stating that the actual potential production capability of the project in any particular year exceeds the authorized production capacity. Specifically, Sabine Pass determined, based on more recent, detailed engineering analysis and certain design changes approved through the Commission's post-authorization final design and approval process, that it could, on any given day, under optimal operating conditions, produce more LNG than originally estimated, using the same power from its turbines and other already authorized facilities. Therefore, Sabine Pass requested an increase in the authorized combined production capacity for the four LNG trains comprising Stages 1 and 2 from approximately 16 mtpa, or 2.2 Bcf/d, to 20 mtpa, or 2.76 Bcf/d.[6] Sabine Pass emphasized that the proposed increase in maximum production capacity represents the peak LNG production and export capability of the trains under optimal operating conditions. Sabine Pass stated that its proposal requires no additional construction or modification of previously authorized facilities. The February 20 Order found that it is appropriate for authorizations to reflect

---

[4] *Sabine Pass Liquefaction, LLC,* 144 FERC ¶ 61,099 (2013).

[5] On September 30, 2013, Sabine Pass Liquefaction Expansion, LLC (Sabine Pass Expansion), an affiliate of Sabine Pass, filed an application in Docket No. CP13-552-000 to further expand the Liquefaction Project by adding Trains 5 and 6 in Stage 3. Together, Trains 5 and 6 would produce an additional 503 Bcf of LNG per year and have a nameplate capacity rating of 9 mtpa of LNG. Concurrently, Cheniere Creole Trail Pipeline, L.P. (Creole Trail) filed an application in Docket No. CP13-553-000 to construct 104.3 miles of pipeline and 53,000 horsepower of compression to deliver additional feed gas to the Liquefaction Project. Those applications are pending.

[6] In 2010 and 2011, the United States Department of Energy (DOE) authorized Sabine Pass to export up to 16 mtpa, or 2.2 Bcf/d, to all Free and non-Free Trade Agreement nations. Sabine Pass acknowledges it will need additional authorization from DOE to export more than 2.2 Bcf/d.

the maximum or peak capacity at optimal conditions, as such level represents the actual potential production of LNG. Thus, the February 20 Order determined that Sabine Pass's proposals were not inconsistent with the public interest under section 3 of the NGA. In reaching this conclusion, the Commission addressed the issues raised by Sierra Club in its protest.

## II.   **Request for Rehearing**

4.      In its petition for rehearing, Sierra Club contends that the February 20 Order failed to examine (1) the "no action" alternative; (2) numerous direct or indirect adverse environmental impacts from increased LNG production, including increased air emissions from gas pretreatment activities and compressor stations and other pipeline equipment necessary to deliver increased gas volumes to the terminal site, and increased shipping traffic; (3) Sabine Pass Liquefaction Expansion's (Sabine Pass Expansion) proposal to construct and operate Trains 5 and 6 and Creole Trail's proposal to construct pipeline and compression facilities, as connected and cumulative actions; and (4) the indirect, reasonably foreseeable effects of induced gas production, increased natural gas prices, and increased domestic use of coal. Sierra Club also contends the Commission failed to coordinate with the United States Department of Energy (DOE) and that an environmental impact statement (EIS) was required.

## III.   **Discussion**

5.      Sierra Club maintains that the February 20 Order and Commission staff's January 2014 EA in this proceeding violated the National Environmental Policy Act (NEPA) by failing to examine the environmental effects of the no-action alternative.[7] Sierra Club argues that NEPA requires the Commission to compare the environmental effects of the currently-authorized maximum LNG production capacity (2.2 Bcf/d) of the Liquefaction Project and the proposed maximum capacity (2.76 Bcf/d), while maintaining the same assumptions about facility design and ambient conditions. Sierra Club claims that under the no-action alternative, which would deny Sabine Pass's application for an increase in the authorized total LNG production capacity of the Liquefaction Project, emissions from different sources at the facility will decrease by 20 percent relative to the levels contemplated in the 2011 Liquefaction Project EA, or put differently, these emissions will be 25 percent higher under the proposed action as compared to the no-action

---

[7] NEPA requires agencies to prepare a statement on the environmental impact of major Federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C)(i) (2012). The Council on Environmental Quality's (CEQ) regulations require the environmental analysis for a proposed action to "evaluate all reasonable alternatives," including the no-action alternative. 40 C.F.R. § 1502.14(d) (2014).

Docket No. CP14-12-001                                               - 4 -

alternative.[8]   In the EA for this proceeding, staff noted that the Commission had already found construction of all the facilities necessary to achieve the higher level of production to be in the public interest.  The EA did not recommend the no-action alternative,[9] reasoning that to do so would not be consistent with the Commission's previous authorization of those facilities in conjunction with the Liquefaction Project.

6.      In addition, contrary to Sierra Club's claim, the EA did consider the environmental effect of potential additional production under the proposed amendment.  As explained in the February 20 Order, the EA determined that there will be no changes to the factors that influence air quality modeling (e.g., emission rates, air/fuel ratios, exit stack temperatures, and exit flow rates).  Thus, operation of the facilities at the maximum design capacity when possible, as proposed, would not alter any of the design parameters used in the previous air modeling analysis discussed in the Liquefaction Project EA.[10] The previous air modeling was based on maximum emissions to be generated from Trains 1-4 operating continuously at 100 percent load, even though Sabine Pass's production projects reflected, for example, conservative assumptions on downtimes for maintenance.[11]  Thus, impacts associated with the increase being approved here were captured in that earlier modeling.[12]  Moreover, the February 20 Order notes that Sabine Pass has obtained all necessary air permits for the Liquefaction Project, as modified in 2013, from the Louisiana Department of Environmental Quality.[13]

7.      Sierra Club further argues that the February 20 Order failed to discuss certain direct or indirect adverse environmental impacts from the additional LNG production, including increased emissions from Sabine Pass's gas pretreatment activities[14] and from

---

[8] Rehearing request at 3.  Sierra Club also contends that the EA was based on outdated information.  Sierra Club, however, fails to identify any information in the record of this proceeding that is stale or outdated.

[9] EA, Part B.

[10] February 20 Order, 146 FERC ¶ 61,117 at P 16.

[11] Sabine Pass's December 31, 2013 supplemental response to staff's November 13, 2013 environmental data request.

[12] Id.

[13] Id. P 17.

[14] Sabine Pass's gas pre-treatment system removes solids, carbon dioxide, sulfur dioxide, hydrogen sulfide, particulate matter, volatile organic compounds, nitrogen oxide, water, and mercury from the gas stream before the resulting dry gas enters the refrigeration systems for liquefaction.

Creole Trail's compressor stations and its proposed pipeline necessary to deliver increased volumes to the terminal site. We disagree. Sierra Club's argument assumes that the Liquefaction Project will receive and process additional supplies of domestic natural gas in order to achieve the increase in authorized production capacity that the February 20 Order approved.[15] However, there has been no proposed increase in the capacity of pipelines capable of delivering gas to the Sabine Pass LNG terminal made in conjunction with the instant proposal. Instead, the contemplated increase in production, which we emphasize will be achievable only under optimal operating conditions and not on a daily basis, will be the result of design changes and engineering efficiencies which allow more effective use of the power available.[16] Because Sabine Pass does not propose design or operational changes to the gas turbines, the EA in this proceeding also noted that there would be no increase in fuel gas usage.[17] Thus, the authorization in the February 20 Order will not result in additional air emissions beyond those already considered in our 2012 authorization of the Liquefaction Project, as amended in 2013.

8.      Sierra Club also incorrectly contends that the February 20 Order failed to discuss the environmental effects of increases in shipping traffic beyond the current maximum of 400 ships per year (up to 250,000 cubic meters in size) and increased associated emissions and that the Commission did not justify its vessel size and frequency assumptions. We disagree.

9.      The February 20 Order explained, as discussed in the EA, that the environmental review of the Liquefaction Project had evaluated impacts of vessel emissions based on a maximum of 400 ships per year and a maximum vessel size of 250,000 cubic meters and that Sabine Pass's request to increase the maximum authorized peak production capacity did not contemplate or require any increase in the number of vessels, dredging to the area to accommodate larger vessels, a relocation of the berthing area, or changes to the loading/unloading rate for the vessels. Thus, the request will not result in a change in total facility and marine emissions beyond those previously studied.[18] Sierra Club's claim that the capability to produce additional volumes will necessarily require shipping

---

[15] Rehearing request at 4 ("Thus, it appears that each of these [pollution] streams would increase by 25% *if the volume of gas subject to pretreatment increased by that amount.*" (Emphasis added.)); *Id.* at 6 ("The [Creole Trail] pipeline modifications are particularly relevant, because they may be necessary to deliver the additional gas to the facility that will be processed pursuant to the requested output increase....").

[16] Those design and engineering efficiencies are explained in detail in the February 20 Order at P 4.

[17] EA, Part A.

[18] February 20 Order, 146 FERC ¶ 61,117 at P 18.

capacity beyond the 400 ships per year previously studied is unsupported.[19]  Our analysis of potential impacts of the Liquefaction Project was generally based on conservative projections, i.e., activity levels higher than those which would necessarily be achieved under day-to-day operations and despite the authorized increase in maximum peak day production, increased production is not anticipated to be achievable on a daily basis. Sierra Club also asserts for the first time that the Commission must explore as part of its environmental analysis here whether the expanded output could be exported by fewer or smaller ships than were analyzed in the Liquefaction Project EA.  We disagree.  To the extent Sierra Club seeks a reduction in the maximum number or size of ships, such action is beyond the scope of this proceeding.

10.      Sierra Club asserts that the February 20 Order fails to consider the Sabine Pass Expansion proposal to construct Trains 5 and 6 and the Creole Trail proposal to construct compression facilities as "connected actions,"[20] or the cumulative impacts[21] of those proposals.  Sierra Club contends that Creole Trail's proposed pipeline modifications may be necessary to deliver additional gas to the Liquefaction Project to increase LNG production as requested in this proceeding.

11.      As previously noted in this order, the increase in maximum LNG production capacity authorized by the February 20 Order will be accomplished as the result of design changes and engineering efficiencies; no additional natural gas transportation capacity is contemplated in connection with this change, nor does Sabine Pass's proposed increase in authorized production capacity depend on the construction and operation of Trains 5 and 6.  Accordingly, Creole Trail's proposed pipeline additions and Sabine Pass Expansion's proposed Trains 5 and 6 are not interrelated actions that are necessary to the February 20

---

[19] Rehearing request at 5 ("Increasing exports by 25% presumably requires 25% more shipping capacity . . .").

[20] 40 C.F.R. § 1508. 25(a)(1) (2014).  Connected actions are "closely related and therefore should be discussed in the same impact statement.  Actions are connected if they:

(i)      Automatically trigger other actions which may require environmental impact statements.

(ii)      Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii)      Are interdependent parts of a larger action and depend on the larger action for their justification."

[21] 40 C.F.R. § 1508.25(a)(2) (2014).

Docket No. CP14-12-001    - 7 -

Order's establishment of an increased maximum production authorization for the previously authorized Liquefaction Project facilities, and Sierra Club's contention that they are connected actions is not correct. Moreover, as explained in the EA and the February 20 Order, since the proposed action involves no new construction or modification of existing facilities, it will not contribute to any cumulative impacts.[22]

12.     Sierra Club further argues that the February 20 Order failed to consider the "indirect effects" of LNG exports on gas production and pricing, including inducement of additional natural gas production and increases in domestic coal consumption that will result from higher gas prices.[23] Relying on the Energy Information Agency's (EIA) January 2012 LNG Export Study, Sierra Club asserts that these indirect effects are reasonably foreseeable. In addition, Sierra Club claims that Commission's environmental analysis must consider the effects of the DOE action approving the exportation of additional LNG.[24]

13.     We believe the February 20 Order adequately addressed these issues, which were also raised and addressed in the 2012 Order authorizing construction of the Liquefaction Project.[25] First, with respect to economic harms, such as raising domestic gas prices, consistent with the 2012 Order, the February 20 Order explained that DOE has not delegated to the Commission any authority to approve or disapprove the import or export of natural gas as a commodity or to consider the economic arguments raised by Sierra

---

[22] EA, Part B; February 20 Order, 146 FERC ¶ 61,117 at P 19. The February 20 Order also acknowledged the possibility of other LNG projects in the Gulf Coast area, but noted that the 2012 Order stated that it could not meaningfully analyze the potential environmental impact of possible future projects. *Id.* Sierra Club does not challenge this finding.

[23] As defined in CEQ regulations, indirect effects are

"caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508(b) (2014).

[24] Rehearing request at 7-8.

[25] The EA in Part B noted that these issues were discussed in the Liquefaction Project EA.

Docket No. CP14-12-001                                                        - 8 -

Club as part of the Commission's public interest determination.[26]  Thus, the issue of
whether the export of LNG will cause economic harm is beyond the Commission's
purview.  Second, with respect to the issue of environmental impacts from induced
production, the February 20 Order again referenced the 2012 Order, which explained that
the impacts which may result from additional shale gas development are not "reasonably
foreseeable."  The 2012 Order stated that no specific shale gas play had been identified
and that the Liquefaction Project did not depend on additional shale gas production,
which may occur for reasons unrelated to the project and over which the Commission has
no control.[27]  In addition, the 2012 Rehearing Order explained that Sierra Club's reliance
on the EIA Export Study is misplaced because the report cautions that projections of
energy markets over the long term are highly uncertain and subject to unforeseen
events.[28]

14.       Sierra Club contends that the Commission failed to consult or coordinate with
DOE, a cooperating agency for the Liquefaction Project, in reviewing the application in
this proceeding and that the Commission failed to explain the relationship between the
proposal here and DOE action.  We disagree.  The February 20 Order clearly states that
Sabine Pass will need to receive additional authorization from DOE to export more than
2.2 Bcf/d of LNG.[29]  The February 20 Order also explains that DOE has exclusive
jurisdiction over the export of natural gas as a commodity; DOE has delegated to the
Commission authority to approve or disapprove the construction and operation of
particular facilities, the site at which such facilities will be located, and with respect to
natural gas that involves the construction of new domestic facilities, the place of entry for
imports or exit for exports.[30]  In addition, the Commission has previously addressed the
role of DOE as a cooperating agency in the Commission's approval of the Liquefaction
Project.[31]  Under CEQ regulations, upon the request of the lead agency (in this case, the
Commission), any other Federal agency which has jurisdiction by law shall be a
cooperating agency.[32]  The Commission requested DOE to be a cooperating agency in the

---

[26] February 20 Order, 146 FERC ¶ 61,117 at P 10 and fn. 17; 2012 Order,
139 FERC ¶ 61,039 at P 27 (citing *National Steel Corp.*, 45 FERC ¶ 61,100, at 61,333
(1998)).

[27] February 20 Order, 146 FERC ¶ 61,117 at P 15 (citing 2012 Order, 139 FERC
¶ 61,039 at PP 94-99).

[28] 2012 Rehearing Order, 140 FERC ¶ 61,076 at P 14 (2012).

[29] February 20 Order, 146 FERC ¶ 61,117 fn.10.

[30] *Id.* P 10.

[31] 2012 Rehearing Order, 140 FERC ¶ 61,076 at PP 31-32.

Docket No. CP14-12-001                                            - 9 -

preparation of the Liquefaction Project EA in light of DOE's earlier grant of authorization to Sabine Pass to export up to 2.2 Bcf/d of LNG.[33]  Here, the Commission did not request DOE to be a cooperating agency because, unlike the Liquefaction Project, no new export facilities were proposed.

15.     Finally, Sierra Club contends that the Commission should have prepared a full environmental impact statement (EIS), because there is a "substantial question" as to whether emissions from pipeline gas delivery and pretreatment associated with the proposed action will have significant impacts, citing to CEQ draft guidance on NEPA and greenhouse gas (GHG) emissions.[34]  Sierra Club made a similar assertion in connection with the Liquefaction Project proposal.  In rejecting this argument, the 2012 Rehearing Order stated that the CEQ draft guidance on NEPA and GHG emissions contains a triggering level for considering GHG emissions in a NEPA analysis and is not an indicator of "significance" for NEPA purposes; rather it is an indicator that a quantitative or qualitative analysis of GHG emissions may be meaningful to decision makers.[35]  Accordingly, Sabine Pass's proposal does not constitute a significant impact on the quality of the human environment that would warrant preparation of an EIS.

The Commission orders:

        Sierra Club's March 24, 2014 request for rehearing is denied, as discussed in the body of this order.

By the Commission.

( S E A L )


                                                Kimberly D. Bose,
                                                Secretary.


---

[32] 40 C.F.R. § 1501.6 (2014).

[33] DOE/FE Order Nos. 2833 (2010) and 2961 (2011).

[34] Rehearing request at 8-9.

[35] 2012 Rehearing Order, 140 FERC ¶ 61,076 at P 25 (citing CEQ *Draft Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions* (February 18, 2010)).

Document Content(s)

CP14-12-001.DOCX...................................................1-9

ATTACHMENT D

149 FERC ¶ 61,119
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Cheryl A. LaFleur, Chairman;
                      Philip D. Moeller, Tony Clark,
                      and Norman C. Bay.

| | |
|---|---|
| Freeport LNG Development, L.P. | Docket No.  CP12-29-001 |
| | |
| Freeport LNG Development, L.P. | Docket No.  CP12-509-001 |
| FLNG Liquefaction, LLC | |
| FLNG Liquefaction 2, LLC | |
| FLNG Liquefaction 3, LLC | |

ORDER DENYING REHEARING AND CLARIFICATION

(Issued November 13, 2014)

1.      On August 29, 2014, Sierra Club and Galveston Baykeeper (collectively, Sierra Club) jointly filed a timely request for rehearing of the Commission's July 30, 2014 Order authorizing Freeport LNG Development, L.P.'s request to modify the previously authorized liquefied natural gas (LNG) facilities at its existing Quintana Island terminal located near the City of Freeport, in Brazoria County, Texas, to facilitate the export of LNG (Phase II Modification Project).[1]  The July 30 Order also authorized FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC, to site, construct, and operate natural gas liquefaction facilities, pretreatment plant facilities, and several interconnecting pipelines and utility lines to support export operations at the Quintana Island terminal (Liquefaction Project).[2]  As discussed below, we will deny rehearing.

---

[1] *Freeport LNG Development, L.P.*, 148 FERC ¶ 61,076 (2014) (July 30 Order).

[2] FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC, are Delaware limited liability companies that are wholly-owned subsidiaries of Freeport Expansion, L.P., a Delaware limited partnership which in turn is owned by Freeport LNG Development.  We use the name "Freeport LNG" herein to refer to all the entities collectively.

Docket Nos. CP12-29-001 and CP12-509-001                                    - 2 -

## I.    **Background**

2.      In 2004, the Commission authorized Freeport LNG to site, construct and operate an LNG terminal with a vaporization capacity of 1.5 billion cubic feet (Bcf/d), located on Quintana Island (Phase I Project), for the purpose of importing LNG.[3]  As relevant here, the Phase I Project is comprised of one marine berthing dock with the capability of unloading up to 200 LNG vessels per year; two 160,000 cubic meter full containment LNG storage tanks; LNG vaporization systems; and associated facilities.  On June 10, 2004, staff issued a General Conformity Determination to ensure that the Phase I facilities did not violate the Texas State Implementation Plan that included the emissions from the estimated 200 LNG vessels per year.[4]

3.      In 2006, the Commission authorized an expansion of the terminal's send-out capacity from 1.5 Bcf/d to 4.0 Bcf/d[5] (Phase II Project).  The 2006 Order also authorized an additional marine berthing dock and associated transfer facilities for LNG vessels; new and expanded vaporization systems to increase the vaporization capacity; and an additional LNG storage tank.  Freeport LNG projected an additional 200 LNG vessels beyond those projected for the Phase I Project.  Accordingly, the environmental assessment (EA) prepared for the Phase II Project analyzed the incremental impacts of the additional 200 LNG vessels, for a total of 400 LNG vessels per year.[6]  The Phase II facilities have not yet been constructed.

---

[3] *Freeport LNG Development, L.P.,* 107 FERC ¶ 61,278 (2004), *order granting reh'g and clarification,* 108 FERC ¶ 61,253 (2004).

[4] Section 176(c) of the Clean Air Act requires a federal agency to demonstrate that a proposed action conforms to the applicable State Implementation Plan, which is the state's plan to attain the National Ambient Air Quality Standards for nonattainment pollutants.  *See* 42 U.S.C. § 7506(c).  A General Conformity Determination is required when the federal agency determines that an action would generate emissions exceeding conformity threshold levels of pollutants in the nonattainment area, and assesses whether the federal action will conform with the State Implementation Plan.  A federal agency cannot approve or support activity that does not conform to an approved State Implementation Plan.  *See* 40 C.F.R. § 93.157(a) (2014).

[5] *Freeport LNG Development, L.P.,* 116 FERC ¶ 61,290 (2006) (2006 Order).

[6] We note that the Commission issued a General Conformity Determination for the Phase II Project.  However, pursuant to EPA's General Conformity regulations, because the project was not constructed within five years, the General Conformity Determination expired.  *See* 40 C.F.R. § 93.157(b).

4.    On May 6, 2009, the Commission authorized Freeport LNG's request to operate the existing LNG terminal facility for the additional purpose of exporting foreign-source LNG on a short-term basis, and to construct and operate a boil-off gas (BOG) liquefaction system and an LNG truck delivery system to provide alternative sources of LNG[7] (Freeport LNG Export Project and BOG/Truck Project).

5.    On December 9, 2011, and August 31, 2012, Freeport LNG filed applications under the Natural Gas Act (NGA) section 3 requesting authorizations, respectively, to modify the Phase II facilities, and to site, construct, and operate natural gas liquefaction facilities, pretreatment plant facilities, and several interconnecting pipelines and utility lines to support export operations at the Quintana Island terminal (collectively, Freeport LNG Projects).

6.    On June 16, 2014, staff issued an environmental impact statement (EIS) to assist the Commission in its decision making with respect to the Freeport LNG Projects. The EIS addressed comments received on the March 14, 2014 draft EIS. The EIS concluded that the impacts from the construction and operation of the Freeport LNG Projects, while resulting in some significant and unavoidable impacts to residents of the Town of Quintana, will be temporary and could be minimized by the recommended conditions.

7.    The July 30 Order authorizing the Freeport LNG Projects concurred with the EIS's findings, and rejected Sierra Club's comments that the EIS should have considered the indirect and cumulative effects of additional natural gas production which would allegedly be induced by the Freeport LNG Projects. We explained that such production was neither caused by the Freeport LNG Projects, nor were the impacts from such production "reasonably foreseeable," as it is speculative not only as to where the gas processed by the Freeport LNG Projects will originate, but where the wells, gathering lines, and other infrastructure associated with such development may occur.[8]

8.    The July 30 Order also declined to address Freeport LNG's and Sierra Club's competing claims with respect to the purported beneficial and adverse impacts of natural gas exports (including environmental impacts), noting that impacts associated with the export of the commodity natural gas fall under the Department of Energy's (DOE) purview, while the Commission's NGA section 3 review is limited to consideration of the impacts of the siting, construction, and operation of the Freeport LNG Projects facilities.[9]

---

[7] *Freeport LNG Development, L.P.*, 127 FERC ¶ 61,105 (2009).

[8] July 30 Order, 148 FERC ¶ 61,076 at PP 77-78.

[9] *Id.* at P 32.

Docket Nos. CP12-29-001 and CP12-509-001                                         - 4 -

9.    The July 30 Order explained that the 1977 Department of Energy Organization Act[10] transferred the regulatory functions of NGA section 3 to the Secretary of Energy and that, subsequently, with respect to the import or export of natural gas, the Secretary delegated to the Commission the authority to approve or disapprove the construction and operation of facilties, the site at which the facilities would be located, and the place of entry for imports or exit for exports.[11]  DOE retains a separate obligation under NGA section 3 to authorize the import or export of the commodity natural gas, including LNG, unless it finds that the import or export will not be consistent with the public interest. Pursuant to this authority, in orders issued May 17, 2013, and November 15, 2013, the Department of Energy's Office of Fossil Energy (DOE/FE) authorized Freeport LNG to export a total of 1.8 Bcf/d of LNG.[12]  The November 15 Order found that "on balance," the potential negative impacts of Freeport LNG's proposed exports "are outweighed by the likely economic benefits and by other non-economic or indirect benefits…."[13]

10.    DOE's November 15 Order explained that this was a preliminary finding on all issues except environmental issues, and was therefore conditioned on DOE's "satisfactory completion of the environmental review process."[14]  Noting that it was participating in the Commission's National Environmental Policy Act (NEPA) review as a cooperating agency,[15] the November 15 Order stated that, "when the environmental review is complete, DOE will reconsider this conditional Order in light of the information gathered as part of that review."[16]

11.    The Commission's July 30 Order concurred with the EIS's findings that impacts from the construction and operation of the Freeport LNG Projects, while resulting in some significant and unavoidable impacts to residents of the Town of Quintana, will be

---

[10] 42 U.S.C. § 7151(b) (2006).

[11] July 30 Order, 148 FERC ¶ 61,076 at P 27, n.11.

[12] *See* July 30 Order, 148 FERC 61,076 at P 17, n.6.

[13] DOE/FE Order No. 3357 at 148-157.

[14] DOE/FE Order No. 3357 at 19.

[15] The Council on Environmental Quality regulations implementing NEPA define "cooperating agency" as "any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect" to proposed actions for which a NEPA analysis is prepared.  *See* 40 C.F.R. § 1508.5 (2014).

[16] DOE/FE Order No. 3357 at 19.

Docket Nos. CP12-29-001 and CP12-509-001                                                - 5 -

temporary and minimized with a number of conditions recommended in the EIS. The July 30 Order concluded that, with the adoption of the environmental conditions, the Freeport LNG Projects are not inconsistent with the public interest.[17]

## II.      **Rehearing Request**

12.      In its rehearing request of the July 30 Order, Sierra Club contends that: (1) the Commission should have considered "induced natural gas production" as an indirect effect of the Freeport LNG Projects; (2) the Commission should have considered the cumulative impacts of existing and proposed LNG export projects; (3) the Commission failed to analyze impacts from changes in electricity generation, including increases in greenhouse gas emissions (GHG) caused by domestic gas price increases; (4) the Commission violated NEPA by making erroneous assumptions about the "no action alternative"; (5) the Commission failed to take a hard look at the projects' air pollution impacts; (6) the EIS relied on an improper environmental baseline for LNG vessel traffic; (7) the Commission's General Conformity Determination violates NEPA and the Clean Air Act; (8) the Commission should have considered the risk of a vessel fire affecting nearby industrial facilities; and (9) the Commission erroneously relied on DOE's NGA section 3 public interest determination.

## III.      **Discussion**

### 1.      **Indirect Effects**

13.      Sierra Club argues that "induced natural gas production" is "plainly an indirect effect of the construction and operation" of the Freeport LNG Projects.[18] It argues that the projects will increase natural gas production, and cites as support to various reports, including NERA Economic Consulting's 2012 "Macroeconomic Impacts of LNG Exports from the United States," Deloitte MarketPoint's "Analysis of Economic Impact of LNG Exports from the United States," and the Energy Information Administration's (EIA) 2012 "Effect of Increased Natural Gas  Exports on Domestic Energy Markets" (EIA LNG Export Study).[19]

14.      Specifically, Sierra notes that the EIA LNG Export Study predicts that 63 percent of the demand created by U.S. LNG export projects will come from increased natural gas

---

[17] July 30 Order at P 35.

[18] Sierra Club Rehearing Request at 4-5.

[19] *Id.* at 6.

production, with 72 percent of this increase coming from shale gas.[20]  Sierra Club extrapolates that the Freeport LNG Projects' export of 1.8 Bcf/d of natural gas will create at least 1.8 Bcf/d of additional gas demand; that roughly 63 percent of this demand, or 1.13Bcf/d, would be satisfied by new production, and that of this new production, roughly 72 percent would come from shale gas, and 28 percent from other sources. Sierra Club adds that the Commission has not "identified or offered any explanation as to how exports could occur without causing an increase in production."[21]

15.    Contrary to Sierra Club's suggestion, the Commission has never affirmatively asserted that LNG exports will not induce natural gas production in the United States. However, even if the Commission could reasonably determine how much, if any, of the export volumes associated with the Freeport LNG Projects will derive from increased gas production, we have consistently found under the circumstances presented to date that the impacts from additional production are not reasonably foreseeable, as it is unknown where, or when, such production would occur.[22]

16.    The Council on Environmental Quality (CEQ) regulations require agencies to consider the indirect impacts of proposed actions.  Indirect impacts are "caused by the proposed action" and occur later in time or farther removed in distance than direct impacts, but are still "reasonably foreseeable."[23]  Indirect impacts may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water.[24]  For an agency to include consideration of an impact in its NEPA analysis as an indirect effect, approval of the proposed project and the related secondary effect must be causally related, i.e., the agency action and the effect must be "two links of a single chain."[25]

---

[20] *Id.* at 7.

[21] *Id.* at 5.

[22] *See, e.g., Dominion Cove Point LNG, LP,* 148 FERC ¶ 61,244, at P 231 (2014); *Sabine Pass Liquefaction, LLC,* 139 FERC ¶ 61,039, at PP 94-99, *reh'g denied*, 140 FERC ¶ 61,076,  at PP 8-22 (2012); *Cheniere Creole Trail Pipeline, L.P.,* 142 FERC ¶ 61,137 at PP 51-60, *order on reh'g,* 145 FERC ¶ 61,074 at PP 8-19 (2013).

[23] 40 C.F.R. § 1508.8(b) (2014).

[24] *Id.*

[25] *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394 (9th Cir. 1980).

Docket Nos. CP12-29-001 and CP12-509-001                                    - 7 -

17.     The potential environmental effects associated with additional natural gas production are neither sufficiently causally related to the Freeport LNG Projects to warrant a detailed analysis, nor are the potential environmental impacts reasonably foreseeable, as contemplated by the CEQ regulations.

18.     With respect to causation, as noted in the July 30 Order, Sierra Club fails to identify any induced natural gas production directly associated with the Freeport LNG Projects, other than to note Freeport LNG's application, in which it predicts that "the natural gas supply underlying the proposed exports will come primarily from the highly liquid Texas market" and that the project "will benefit from expanded gas production capacity in the Eagle Ford, Barnett, and Haynesville Shales."[26]

19.     Moreover, Sierra Club fails to explain how identifying possible locations from which the gas processed by the Freeport LNG Projects may originate means that the gas will come from future, *induced* natural gas production, as opposed to from existing production, particularly in light of the longtime, extensive natural gas development that has already occurred in Texas, including in its shale areas.

20.     Sierra Club's reliance on the NERA, Deloitte, and EIA studies is misplaced. These studies provide general economic analyses concluding that increased LNG exports may increase domestic natural gas production, but they do not provide specificity that would assist in informing the Commission's decision here.  For example, EIA's projections that increased exports will lead to increased domestic production, and that 72 percent of the increase will come from shale, do not project that gas processed by any particular export facility will mirror the estimated percentages.  Moreover, we note that the EIA report includes the caveat that projections involving energy markets are "highly uncertain and subject to many events that cannot be foreseen, such as supply disruptions, policy changes, and technological breakthroughs."[27]

21.     Accordingly, such information does not meaningfully inform the Commission on whether the Freeport LNG Projects will use natural gas derived from new production or existing production.  Moreover, as noted above, even if the Commission could reasonably conclude that the Freeport LNG Projects will cause additional natural gas production, the potential impact from such production, if any, is not reasonably foreseeable, given that the amount, timing, and location of development activity is simply unknowable at this time.

---

[26] Sierra Club Rehearing Request at 11.

[27] *See* EIA Export Study at 3.  *See also Dominion Cove Point LNG, LP,* 148 FERC ¶ 61,244 at P 235.

22.    An impact is reasonably foreseeable if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."[28]  Courts have noted that the starting point of any NEPA analysis is a "rule of reason," under which NEPA documents "need not address remote and highly speculative consequences."[29]  Courts are clear that an agency is not required "to engage in speculative analysis" or "to do the impractical, if not enough information is available to permit meaningful consideration."[30]

23.    Sierra Club claims that "additional tools such as EIA's" study "are capable of providing more robust and precise predictions of where induced production will occur."[31]  It asserts that, consistent with the D.C. Circuit's opinion in *Scientists' Institute for Public Information, Inc. v. Atomic Energy* (*Scientists' Institute for Public Information*),[32] since DOE determined such studies to be sufficient to support an analysis of price impacts, "they are also sufficient to support an analysis of environmental impacts."[33]

24.    However, we find the studies that Sierra Club cites are unavailing.  They set forth general economic projections with respect to LNG exports in the United States, and do not assist the Commission in reasonably estimating how much of Freeport LNG's export volumes will come from current versus future natural gas production, or where and when that future production may be located, much less any associated environmental impacts of such production.

25.    Sierra Club's reliance on *Scientists' Institute For Public Information, Inc.,* is equally misplaced.  There, the D.C. Circuit faulted the Atomic Energy Commission (AEC) for failing to prepare *any* NEPA analysis for its proposed liquid metal fast breeder reactor program.  The D.C. Circuit noted that, while the AEC had prepared a complex

---

[28] *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992).

[29] *Hammond v. Norton*, 370 F.Supp. 2d 226, 245-46 (D.D.C. 2005).

[30] *N. Plains Res. Council v. Surface Transp. Bd*, 668 F.3d 1067, 1078 (9th Cir. 2011).  *See also Habitat Educ. Ctr v. U.S. Forest Serv.*, 609 F.3d 897 (7th Cir. 2010) (an environmental impact would be considered too speculative to include in the NEPA document if, at the time the document is drafted, the impact cannot be described with sufficient specificity to make its consideration useful to a reasoned decision maker).

[31] Sierra Club Rehearing Request at 11.

[32] 481 F.2d 1079, 1097 (D.C. Cir. 1973).

[33] Sierra Club Rehearing Request at 11.

Docket Nos. CP12-29-001 and CP12-509-001                                          - 9 -

cost/benefit analysis in attempting to justify the proposed program, it failed to attempt to include a consideration of the environmental costs and benefits associated with the proposed program.

26.     Unlike the AEC, Commission staff prepared an EIS that thoroughly considered the potential impacts of the Freeport LNG Projects, which informed the Commission's decision.  Moreover, the D.C. Circuit was persuaded that a NEPA analysis should have been prepared because the AEC had existing detailed estimates on the amount of waste and the amount of land area necessary for storage of the waste, as well as "much information on alternatives to the program and their environmental effects."[34]  For the reasons discussed above, the Commission has no existing detailed or quantifiable information with respect to additional production that might be induced by the Freeport LNG Projects that would assist us in a meaningful analysis.

27.     Sierra Club also challenges the July 30 Order's explanation that, in part, the indirect effects of induced gas production need not be considered because "the purpose of the Projects is not to facilitate additional shale production…over which the Commission has no jurisdiction."[35]  In its rehearing request, Sierra Club states that lack of jurisdiction "does not mean that FERC does not have to consider the environmental effects of this development under NEPA."[36]

28.     We agree that lack of jurisdiction over an action does not necessarily preclude an agency from considering the potential impacts.  However, Sierra Club misunderstands the intent of our statement, which was to reinforce our finding that, because states, and not the Commission, have jurisdiction over natural gas production and associated development (including siting and permitting), the location, timing, and potential impacts from such development are even more speculative.

29.     Sierra Club also argues that in the July 30 Order, the Commission "indicates that induced production need not be considered because DOE has specifically reserved authority over the actual export of natural gas."[37]  Sierra Club cites to the order's discussion of the division of NGA section 3 authority, in which the Commission declined to address impacts associated with the export of natural gas, because such a review falls under DOE's NGA section 3 authority.

---

[34] *Scientists Institute for Public Information, Inc.,* 481 F.2d 1079.

[35] July 30 Order, 148 FERC ¶ 61,076 at P 77.

[36] Sierra Club Rehearing Request at 9.

[37] Sierra Club Rehearing Request at 8.

30.     The Commission did not decline to consider induced natural production in its NEPA analysis because the matter falls under DOE's NGA section 3 authority.  Rather, for all of the reasons discussed above, i.e., because the potential environmental effects associated with additional natural gas production are neither sufficiently causally related to the Freeport LNG Projects to warrant a detailed analysis, nor are the potential environmental impacts reasonably foreseeable, as contemplated by the CEQ regulations, we found that NEPA does not require the Commission, nor is it reasonable for us, to consider induced natural gas production as a factor in our determination.

31.     We affirm our finding that the impact from induced natural gas production is not an indirect effect of the Freeport LNG Projects.[38]

## 2.      Cumulative Impacts

32.      Sierra Club states that the Commission should have analyzed the cumulative impacts of "the many proposed export projects," including, "at a minimum," those already authorized, and "all other export projects to have received conditional authorization from DOE."[39]

33.     We disagree.  The CEQ regulations define cumulative impacts as "the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[40]  A cumulative impact analysis may require an analysis of actions unrelated to the proposed project if they occur *in the project area being analyzed.*[41]  CEQ states that "it is not practical to analyze the cumulative effects of an action on the universe; the list of environmental effects must focus on those that are truly meaningful."[42]  An agency is only required to include "such

---

[38] We note that the Commission has been upheld in finding that it need not consider the environmental impacts of increased natural gas production, in this case in the Marcellus shale, when authorizing projects that may or may not make use of such supplies.  *Cent. N.Y. Oil and Gas Co., LLC,* 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed, sub nom. Coalition for Responsible Growth, et al. v. FERC*, 485 Fed. Appx. 472, 2012 WL 1596341 (2nd Cir., Apr. 17, 2012) (unpublished opinion).

[39] Sierra Club Rehearing Request at 12.

[40] 40 C.F.R. § 1508.7 (2014).

[41] CEQ Guidance, *Considering Cumulative Effects Under the National Environmental Policy Act* (January 1997).

[42] *Id.* at 8.

information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible."[43]

34.     The EIS considered Brazoria County as the projects' geographic study area, and in the cumulative impact analysis considered a number of industrial developments, pipeline developments, oil and gas field developments (including proposed drilling activity in several existing production areas, applications for wells, and drilling activity as far as 22 miles from the Quintana Island terminal), land and air transportation developments, commercial developments, and port and harbor channel developments.[44]  The existing and pending LNG export projects that Sierra Club insists must be considered in the cumulative impact analysis cover a vast geographic scope consisting of tens of thousands of square miles, and neither the CEQ guidance nor case law requires such an analysis.

35.     As discussed in the July 30 Order, we find that Sierra Club seeks a programmatic EIS for a program that is not before the Commission.  The CEQ regulations state that major federal actions for which an EIS may be required include "….programs, such as a group of concerted actions to implement a specific policy or plan; and systematic and connected agency decisions allocating agency resources to implement a specific statutory program…."[45]

36.     The July 30 Order explains that the Freeport LNG Projects do not meet this definition for broad proposals, nor does Sierra Club rebut this finding in its request for rehearing.  The projects concern modifications to previously authorized facilities and development of new liquefaction facilities and LNG export capacity.  Further, as noted in the July 30 Order, the Commission considers proposed projects on their own merits, based on the facts and circumstances specific to each proposal.[46]

### 3.     General Conformity Determination

37.     On July 30, 2014, staff issued for comment a draft General Conformity Determination, which considered whether the construction and operation of Freeport

---

[43] *New York Natural Res. Def. Council, Inc. v. Kleppe*, 429 U.S. 1307, 1311 (1976) (citing *Natural Res. Def. Council v. Calloway,* 524 F.2d 79, 88 (2d. Cir. 1975)).

[44] June 2014 EIS Volume I at 4-240 through 4-266.

[45] July 30 Order, 148 FERC ¶ 61,076 at PP 75-76 (citing 40 C.F.R. § 1508.18(b)(3) (2014)).

[46] July 30 Order, 148 FERC ¶ 61,076 at P 76.

Docket Nos. CP12-29-001 and CP12-509-001                                              - 12 -

LNG's proposed facilities, including operational emissions of the LNG vessels, could go
forward without violating the Texas State Implementation Plan. On July 11, 2014,
Freeport LNG had informed staff that it had revised its projection of LNG ship calls to its
facilities from 400 per year to 250 per year. Accordingly, the draft General Conformity
Determination analyzed the additional 50 ship calls beyond the 200 previously analyzed
in the Phase I Project proceeding. On September 15, 2014, staff issued the final
Conformity Determination, which addressed comments filed by Sierra Club on the draft
General Determination.

38.     On rehearing, Sierra Club argues that the July 30 Order violates the General
Conformity Determination regulations because it "authorizes activities despite the fact
that no final conformity determination" had been made.[47]

39.     We disagree. The Clean Air Act's conformity provisions provide that no federal
agency "shall…approve any activity which does not conform to an applicable
implementation plan."[48] The conformity provisions add that a federal agency must make
a determination that a Federal action conforms to the applicable implementation plan "in
accordance with the requirements of this subpart *before the action is taken.*"[49] (Emphasis
added).

40.     The September 15, 2014 General Conformity Determination found, in response to
Sierra Club's identical comment on the draft General Conformity Determination, that the
"action" contemplated in the General Conformity regulations is the start of project
construction. Freeport LNG received approval to proceed with initial site preparation on
October 17, 2014, and will not receive approval to proceed with further project facility
construction unless and until all pre-construction conditions are satisfied.[50]

41.     Sierra Club also challenges Condition No. 79 of the July 30 Order, which provides
that:

        Freeport LNG shall notify the Commission within 30 days prior to exceeding
        250 LNG ship-calls in a calendar year. This will allow Commission staff to

---

[47] Sierra Club Rehearing Request at 18 (citing 40 C.F.R. § 93.150(b)).

[48] 40 C.F.R. § 93.150(a).

[49] 40 C.F.R § 93.150(b).

[50] We also question how Sierra Club was harmed, given that it provided extensive
comments on the draft General Conformity Determination, which were addressed in the
September 15, 2014 General Conformity Determination.

Docket Nos. CP12-29-001 and CP12-509-001                              - 13 -

ensure that the General Conformity Analysis is revised in accordance with
40 C.F.R. § 93.157(c).

42.     Sierra Club suggests that Condition No. 79 allows Freeport LNG to exceed
250 LNG ship calls so long as it notifies the Commission within 30 days prior to doing
so, and asks that Condition No. 79 be clarified to state that additional ship calls are
prohibited unless and until the Commission actually reaches a revised conformity
determination.

43.     We will deny clarification.  We note that there is nothing in the record to suggest
that Freeport LNG is likely to receive more than the 250 ship calls per year analyzed.  We
further note that Freeport LNG would not be required to seek an amendment to its
section 3 authorization in order to exceed that number.  In any event, if, and when,
Freeport LNG makes a filing pursuant to Condition No. 79, the Commission will
determine at that time what, if any, action is required.

44.     Sierra Club also asserts that the Commission has changed its estimate of the vessel
traffic associated with the Freeport LNG Projects at various stages, with no "adequate
factual basis."  We disagree, and find that the September 15, 2014 General Conformity
Determination clearly explained the revisions.  Specifically, in response to similar
comments Sierra Club filed on the draft General Conformity Determination, the
September 15, 2014 General Conformity Determination explained that both the original
Phase I Project EA and original General Conformity Determination addressed impacts
from 200 ship calls per year, and that the June 2006 EA for the Phase II Project addressed
impacts from an additional 200 ship calls per year projected by Freeport LNG, for a total
of 400 ship calls.  Because, after issuance of the EIS for this proceeding, Freeport LNG
revised its projection of total ship calls to be associated with the Freeport LNG Projects
from 400 ship calls to 250, the September 15, 2014 General Conformity Determination
reflected the revised number.[51]

45.     Sierra Club also argues that the General Conformity Determination improperly
assessed only the additional 50 LNG ship calls per year, rather than the full 250 annual
ship calls Freeport LNG projected.[52]  We disagree.  As discussed in the EIS, the Freeport
LNG Projects must conform with the Houston-Galveston-Brazoria County Texas State
Implementation Plan, which already accounts for the emissions from the 200 ship calls
per year identified in the June 10, 2004 General Conformity Determination for the
original Phase I Project.  Therefore, only the emissions from the additional 50 ships, as

---

[51] *See* September 15, 2014 General Conformity Determination at 2.

[52] Sierra Club Rehearing Request at 20.

Docket Nos. CP12-29-001 and CP12-509-001    - 14 -

identified by Freeport LNG here, needed to be addressed in the General Conformity Determination for the Freeport LNG Projects.

### 4.    NEPA Baseline

46.    As discussed above, since Freeport LNG initially projected that no additional ship traffic beyond that considered in conjunction with the Phase II Project would be associated with the Freeport LNG Projects, the June 2014 EIS analyzed impacts from 400 ship calls per year.[53]  The EIS also noted that very few vessels have visited the existing Freeport LNG terminal.[54]

47.    On rehearing, Sierra Club argues that the EIS should have considered a baseline of the minimal actual vessel traffic, instead of relying on previous NEPA analyses for the Phase II Project.  We disagree.

48.    The Freeport LNG Projects are a modification of the Phase II Project, and therefore the June 2014 EIS updated the findings from the EA prepared for the Phase II Project.  The EIS described the impacts on various resources that would occur due to the modifications proposed here, including vessel impacts, and included additional data on these impacts.  For example, the EIS notes that the number of LNG vessel visits contemplated in association with the Freeport LNG Projects is much higher than the number being experienced under current conditions.  However, the EIS explains that the scientific analysis set forth in the March 2009 EA prepared for the Freeport LNG Export Project and BOG/Truck Project found that the vessel traffic (400 ship calls per year) associated with that project will not adversely affect aquatic biota, and the rationale underlying this finding is equally valid with respect to the 250 ship calls per year contemplated for the Freeport LNG Projects.[55]  The June 2014 EIS also discusses the numerous laws and regulations with respect to ballast water that would minimize ballast water impacts to a number of resources.[56]  Accordingly, we find that the June 2014 EIS properly considered the impacts of the vessel traffic projected to be associated with the Freeport LNG Projects.

---

[53] *See, e.g.,* June 2014 EIS Volume I at 4-217 and 4-238.

[54] June 2014 EIS Volume I at 4-131.

[55] June 2014 EIS Volume 1 at 4-70 (citing Freeport LNG Export Project and BOG/Truck Project Environmental Assessment (Docket Nos. CP03-75-003, CP03-75-004, CP05-361-001, and CP05-361-002), March 13, 2009).

[56] *Id.* at 4-70 through 4-73.

Docket Nos. CP12-29-001 and CP12-509-001                                    - 15 -

## 5.    **Safety Impacts**

49.    Sierra Club asserts that the EIS failed to consider the risk of vessel fire on nearby industrial facilities, and that therefore the Commission did not take the required "hard look" at impacts on public safety.[57]  Sierra Club acknowledges that vessel fire risks were considered in prior NEPA analyses for the Phase I Project, and by the U.S. Coast Guard (Coast Guard), but alleges that the risk of fire to nearby chemical plants was not considered.  Sierra Club argues that recent DOE studies of the effects of LNG vessel fires suggest that hazard zones from vessel fires can extend to zones encompassing nearby industrial facilities such as the chemical plants, but that the risk of fire to these chemical plants was not considered by the Commission.[58]  As discussed in the EIS, ship transits for the Freeport LNG terminal were considered in the 2004 Phase I Project proceeding using similar hazard zones as those described in the DOE study to which Sierra Club refers.[59]  Moreover, the Coast Guard, which exercises regulatory authority over LNG facilities that affect the safety and security of waterways, the ports within those waterways, and the individual facilities within those ports, reviewed the proposed Freeport LNG Projects and concluded that, since the Freeport LNG Projects would not result in an increase in the size and/or frequency of LNG marine traffic over that previously considered, neither a Letter of Intent nor a revision to the existing Water Suitability Assessment was required.[60]

50.    We note that the Coast Guard determines what, if any, vessel traffic and/or facility control measures would be appropriate to adequately address navigational safety and maritime security considerations, and we rely on its expertise.  Further, the Coast Guard continually assesses the waterway based on the most current information, and has the authority to prohibit LNG transfer or LNG vessel movements to protect the waterway, port or marine environment pursuant to a number of statutory authorities including the

---

[57] Sierra Club Rehearing Request at 21.

[58] *Id.*

[59] June 2014 EIS Volume 2 at 188 (citing to May 2012 Report to Congress, "Liquefied Natural Gas Safety Research)."

[60] June 2014 EIS Volume 1 at 4-203.  Pursuant to 33 C.F.R. § 127.007(a), an owner or operator planning new construction to expand or modify marine terminal operations at an existing LNG facility, where such construction, expansion or modification would result in an increase in the size and/or frequency of LNG marine traffic on the associated waterway, must submit to the Coast Guard a Letter of Intent. Under 33 C.F.R. § 127.007(e), the owner or operator must also file or update a Water Suitability Assessment.

Docket Nos. CP12-29-001 and CP12-509-001                    - 16 -

Ports and Waterways Safety Act of 1972,[61] the Magnuson Act,[62] and the Marine
Transportation Security Act of 2002.[63]

51.      The EIS comprehensively analyzed safety issues, including potential impacts
concerning:  hazards associated with substances involved in the liquefaction, storage and
vaporization of LNG; cryogenic and flashing liquid releases; flammable vapor dispersion;
vapor cloud ignition; overpressures; toxic vapor dispersion; past incidents at LNG plants;
and potential hazards associated with operation regarding design and operational
measures to control potential accidents.[64]  Accordingly, we are satisfied the EIS took the
requisite hard look at public safety.

### 6.     Impacts of Increased Domestic Gas Prices

52.      On rehearing, Sierra Club repeats its arguments previously addressed in the EIS
that LNG exports will increase gas production, which, it asserts, will increase domestic
gas prices, and that therefore the EIS should have considered the indirect and cumulative
effects of gas price increases on carbon emissions from domestic electricity production.[65]
The EIS explained that DOE has exclusive jurisdiction over the export of natural gas as a
commodity, and therefore consideration of impacts related to the exportation of the
commodity was not considered in our review.[66]  The EIS further noted that in any event,
studies conducted by NERA Economic Consulting indicate that LNG exports are self-
limiting, in that little or no natural gas will be exported if the price of natural gas in the
U.S. increases much above current expectations.[67]  On rehearing, Sierra Club asserts that
the division of NGA authority between DOE and the Commission does not remove these
effects from the scope of the Commission's EIS.

53.      For the reasons discussed above, the June 2014 EIS analyzed the impacts from the
siting, construction and operation of the Freeport LNG Projects facilities themselves.
Changes in natural gas commodity prices are not an impact of the facilities.  In any event,

---

[61] 33 U.S.C. § 1221, *et seq.*

[62] 50 U.S.C. § 191.

[63] 46 U.S.C. § 701.

[64] *See* June 2014 EIS Volume I at 4-142 through 4-165.

[65] Sierra Club Rehearing Request at 13.

[66] June 2014 EIS Volume I at 216.

[67] *Id.*

we note that any attempt to analyze potential impacts of changes in electricity generation which might result from the construction and operation of the Freeport LNG Projects would require the Commission to consider potential impacts far removed and attenuated from the Freeport LNG Projects.

54.     Specifically, Sierra Club would have the Commission consider:  1) the extent, if any, to which LNG exports will increase domestic gas prices; 2) whether gas price increases would "significantly increase" domestic use of coal for electricity generation; 3) whether the decrease, if any, in domestic gas consumption in response to exports and export-driven price increases would primarily occur in the electric sector, with producers replacing some gas fired electric generation with coal; and 4) the extent to which the shift from gas to coal-fired electric generation would increase emissions of both traditional air pollutants and greenhouse gases.  These steps would require the Commission to engage in speculation upon speculation, and would entail a level of analysis neither contemplated nor required by courts or the CEQ regulations.[68]

### 7.     No Action Alternative

55.     The June 2014 EIS concluded that under the "no action alternative" (i.e., denial of Freeport LNG's application), the environmental impacts described in the EIS would not occur.  The EIS noted that it would be speculative to predict the actions that would be taken by natural gas producers if the Freeport LNG Projects were not built, and any potential associated impacts of those actions.  For example, the EIS noted that it is possible that natural gas infrastructure supplying natural gas to the global market area could be developed in other, unforeseen ways, depending on market conditions, or that other LNG export projects could be built, which could have impacts less than, equal to, or greater than those from the Freeport LNG Projects.[69]

56.     On rehearing, Sierra Club argues that it is not "speculative" whether other means for U.S. LNG exports will be undertaken if the no action alternative is adopted, because

---

[68] *See Sierra Club v. Froehlke*, 486 F.2d 946, 951 (7th Cir. 1973) (*quoting Sierra Club v. Froehlke,* 344 F. Supp. 440, 444 (1972)) (stating that NEPA does not require that every conceivable study be performed and that each problem be documented from every angle to explore its every potential for good or ill.  Rather, what is required is that officials and agencies take a 'hard look" at environmental consequences); s*ee also* CEQ guidance to agencies, which provides that "it is not practical to analyze the cumulative effects of an action on the universe; the list of environmental effects must focus on those that are truly meaningful." *Considering Cumulative Effects Under the National Environmental Policy Act* (CEQ 1997 at 8, Table 1-2).

[69] June 2014 EIS Volume I at 3-1.

Docket Nos. CP12-29-001 and CP12-509-001                                    - 18 -

the "Commission could prevent the adverse environmental impacts of these projects, and the comparable environmental impacts of any other LNG export project, by selecting the no action alternative in each proceeding."[70]

57.    Sierra Club appears to suggest that the Commission make a determination here that based on the records in pending and future applications for LNG export facilities, all or most of those proposals would be inconsistent with the public interest. We decline to do so. As explained above, NGA section 3 provides that applications under that section *shall* be approved if the proposal "will not be inconsistent with the public interest." In making our public interest determination, the Commission considers proposed actions on their own merits, based on the facts and circumstances specific to each proposal. Here, the Commission relied on the findings set forth in a comprehensive EIS, concluded that construction and operation of the Freeport LNG Projects, subject to conditions, would have limited significant environmental impacts, and found that authorizing it is not inconsistent with the public interest.[71]

## 8.    Air Pollution Impacts

58.    The EIS considered the global warming potential (GWP)[72] of 21 for methane over a 100-year period in its analysis of greenhouse gas emissions associated with the Freeport LNG Projects. On rehearing, Sierra Club argues that the EIS should have adopted U.S. Environmental Protection Agency's (EPA) updated GWP of 25, which was issued in November 2013, several months before the draft EIS was issued. Sierra Club adds that the updated GWP doesn't even reflect the current scientific consensus with respect to methane. Sierra Club cites to the Intergovernmental Panel on Climate Change's (IPCC) Fifth Assessment Report, which estimates the value for methane to be 36 over a 100-year period, and 86 over a 20-year period.[73] Sierra Club argues that using science that is

---

[70] Sierra Club Rehearing Request at 14.

[71] We also note that the no action alternative discussed in the EIS is consistent with CEQ Guidance. *See Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations,* 46 Fed. Reg. 18,026 (1981) at 3a (noting that the no action alternative means "the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of allowing the proposed activity...").

[72] The global warming potential is a ratio relative to carbon dioxide that is based on the properties of greenhouse gases' ability to absorb solar radiation as well as the residence time within the atmosphere.

[73] Sierra Club Rehearing Request at 15.

"outdated" is inconsistent with the CEQ regulation requiring agencies to ensure the "scientific integrity…of the discussions and analyses" in NEPA documents.[74]

59.    We find that the EIS appropriately relied on the GWP of 21, because this is the value EPA established for Freeport LNG's GHG Clean Air Act Prevention of Significant Deterioration permit.[75]  While the Commission acknowledges that the GWP of 21 was slightly outdated, when balanced with the benefit of retaining consistency across federal programs, the potential gain in accuracy does not justify the loss of consistency in reporting; in addition, adoption of a different measure likely would have caused stakeholder confusion among the various GWPs used in different programs.  Moreover, we note that the change in GWP from 21 to 25 would have only resulted in a 0.003 percent increase in the emissions of methane from operation of the project, which is well within the margin of error of the emissions calculations.[76]

60.    Sierra Club also challenges the EIS's comparison of the indirect impacts of using electric motors versus on-site gas combustion turbines for generating the electricity consumed by the Freeport LNG Projects.  While Sierra Club generally approves of the Commission's comparison and conclusions, it states that the impacts of the two design alternatives is "incomplete, because NEPA requires a comparison of impacts against the no-action alternative."[77]  Sierra Club states that "the EIS does not indicate the amount of emissions that would be avoided by the no action alternative."[78]

---

[74] *Id.*

[75] With respect to Sierra Club's citation to the IPCC report, we note that EPA's November 29, 2013 rulemaking supported the adoption of the published IPCC Fourth Assessment Report GWP values over the Fifth Assessment Report values.

[76] The operational volatile organic compound (VOC) emissions from the Freeport LNG Projects (existing, and proposed stationary and marine emissions) are identified in the June 2014 EIS at tables 4.11.1-5 and 4.11.1-7.  VOC is assumed to be methane for purposes of calculating carbon dioxide ($CO_2$) equivalents ($CO_2e$).  The change from 21 to 25 would increase the greenhouse gas $CO_2e$ emissions by approximately 200 tons of $CO_2e$.  The $CO_2e$ emissions from burning fossil fuels from the projects, also identified in the tables, is more than 1.6 million tons.  Accordingly, adopting the slight change in GWP would be less than 1/100 of 1 percent, and therefore would have been negligible.

[77] Sierra Club Rehearing Request at 16.

[78] *Id.*

Docket Nos. CP12-29-001 and CP12-509-001                                                - 20 -

61.     We disagree.  As discussed above, the EIS clearly states that with the no action alternative, the environmental impacts of the Freeport LNG Projects would not occur.  There was no need to repeat this statement when discussing the indirect impacts of generating the electricity consumed by the Freeport LNG Projects.  We note that Sierra Club has no issue with the analysis of the alternative designs.

62.     We also reject Sierra Club's assertion that the EIS did not take a hard look at the design alternative of carbon capture and sequestration to mitigate emissions of carbon dioxide removed from pipeline gas as part of the pretreatment process.

63.     As noted above, EPA issued a draft Prevention of Significant Deterioration permit to Freeport LNG for greenhouse gas emissions, which was included in the EIS.[79]  In addressing measures to reduce greenhouse gas emissions, the Prevention of Significant Deterioration permit considered a number of technologies judged to be technically feasible, including carbon capture and sequestration; efficient turbine design; proper thermal oxidizer design; fuel selection; and good combustion, operating, and maintenance practices.  As concluded in the EPA Region 6 Statement of Basis for the draft greenhouse gas permit, carbon capture and sequestration, while technically feasible, would be prohibitively costly.  EPA concluded that implementation of carbon capture and sequestration would impose energy penalties and result in unacceptable collateral increases of various emissions.  Carbon capture and sequestration was also rejected due to other greenhouse gas limiting technologies and/or operational control that EPA also considered.  Accordingly, the carbon capture and sequestration alternative was rejected, and the other technologies were selected as reasonable measures to reduce greenhouse gas emissions.[80]

64.     On rehearing, Sierra Club takes issue with EPA's conclusions, stating that EPA did not address the economic feasibility of carbon capture and sequestration more narrowly applied to emissions from the amine units, and that EPA's conclusions regarding energy penalties and collateral increases in other pollutants "apply primarily, if not exclusively, to application of carbon capture and sequestration to combustion emissions."[81]

65.     We see no need to duplicate EPA's extensive efforts, nor question conclusions based on its expertise in this matter.  Moreover, a number of measures were imposed in

---

[79] June 2014 EIS Volume I at Appendix B.

[80] June 2014 EIS Volume I at 4-261.

[81] Sierra Club Rehearing Request at 17.

the July 30 Order to reduce greenhouse gas emissions. We conclude the EIS took the
requisite hard look at the carbon capture and sequestration alternative.

## 9.  DOE's Conditional Authorization of Exports

66.  Finally, Sierra Club argues that the Commission "mischaracterizes and
inappropriately relies" on DOE's conditional authorization of exports.[82]  Sierra Club
notes that the July 30 Order states that DOE has reviewed impacts on balance in making
its public interest determination, yet emphasizes that "DOE explicitly has not yet
considered environmental impacts."[83]  Sierra Club asserts that the Commission "cannot
base *its* own assessment of the public interest on the belief that DOE has already
determined that the project is consistent with the public interest."[84]

67.  Sierra Club appears to misunderstand the relationship between the Commission's
public interest finding pursuant to NGA section 3 and DOE's NGA section 3 public
interest finding.  The Commission made its independent determination with respect to the
siting, construction and operation of the LNG facilities which will be used to export the
commodity.  In making this finding, the Commission concurred with the June 2014 EIS,
which concluded that construction and operation of the Freeport LNG Project would have
minimal environmental impacts, and that the projects are therefore not inconsistent with
the public interest.

68.  The Commission did not opine as to the sufficiency of DOE's public interest
determination.  While the ultimate viability of proposals to construct and operate LNG
import/export facilities is dependent upon there being concomitant commodity
authorization, as we have previously stated, it would be inappropriate for the Commission
to consider issues in its public interest determination that could duplicate, and possibly
contradict, DOE's own determinations.[85]  To the extent Sierra Club finds fault with

---

[82] *Id.* at 22.

[83] *Id.*

[84] *Id.*

[85] Had DOE denied Freeport LNG any authorization to export the commodity, it is
highly unlikely that the company would have pursued its application before the
Commission to construct facilities, because without commodity authorization, the
facilities would have no use.  Similarly, if DOE ultimately denies export authorization,
the project would likely no longer be financially feasible, notwithstanding the
Commission's issuance of its section 3 authorization to construct the facilities.

Docket Nos. CP12-29-001 and CP12-509-001                                    - 22 -

DOE's public interest determination, the Commission is not the proper venue in which to raise such a challenge.[86]

The Commission orders:

Sierra Club's request for rehearing and clarification of the July 30, 2014 Order is denied as discussed in the body of this order.

By the Commission.

(S E A L)

Kimberly D. Bose,
Secretary.

---

[86] As noted in the July 30 Order at P 32, Sierra Club raised identical concerns in Freeport LNG's export authorization proceeding, which DOE considered in its public interest determination. Similarly, Sierra Club also notes that the Commission, as lead agency for the NEPA review, must inform DOE's analysis of the environmental impacts. As noted above, DOE was a cooperating agency in the preparation of the EIS, and has conditioned its authorization for Freeport LNG to export natural gas on issuance of its own, independent record of decision pursuant to NEPA. Indeed, as a cooperating agency with jurisdiction by law, DOE has an independent legal obligation to comply with NEPA. *See* 40 C.F.R. § 1506.3 (2014). In its conditional export authorizations, DOE/FE noted that, if "a participant in the FERC proceeding actively raises concerns over the scope or substance of environmental review but is unsuccessful in securing that agency's consideration of its stated interest, DOE/FE reserves the right to address the stated interests" within its own proceeding. *See* DOE/FE May 17, 2013 Order No. 3382 at 121, and DOE/FE November 15, 2013 Order No. 3357 at 164.

USCA Case #14-1190     Document #1525844          Filed: 12/05/2014     Page 82 of 102
Document Content(s)

CP12-29-001.DOCX.......................................................1-22

# ATTACHMENT E



# Federal Energy Regulatory Commission
## eFiling User Guide

**System Limits**

- 200 File limit for each security (Public, Privileged, or CEII)
    - Zip files may be used
    - File type restrictions still apply and cannot contain other zipped files
- 50MB limit per file
- 60 character limit per file name including the period and file extension
- 5:00PM EST is the filing deadline, otherwise the submission will receive next business day filing date
- Filings on a non-business day will be considered filed on the next business day
- Acceptable File Types can only be filed

**Before you begin:**

- Ensure the submitter and associated contacts have eRegistered accounts
- Review the Filing Guide and Qualified Documents List
- Know the location of the files and their security
- Make sure the document does not contain tracked changes / redline markings
- All material must be included – No hyperlinks to other material outside the filing

**Step 1: Login**

- Go to FERC Online to access eFiling
- Input your credentials and login

**Step 2: Filing Type**

- Make a selection in each of the columns for your submission
    - Reference the Filing Guide and Qualified Documents List if necessary
    - Filings such as Interventions need the correct menu selections in order for contacts to be added to the Service List
- Click Next

**Step 3: Select Docket**

- Enter the Root Docket of your filing e.g. ER09-111 or P-2545
    - Entering the sub-docket is not necessary
    - Certain filings will have a new docket number and skip this step entirely
- Select the applicable dockets for your submission
    - Quick Entry can be used to select a large number of dockets at one time
    - A list of the selected dockets will be generated



# Federal Energy Regulatory Commission
## eFiling User Guide

- o Click the blue plus sign next to the applicable docket
- Click Next

**Step 4: File Upload**
- Click Choose File and locate a file that will be part of your submission
  - o There are three security tabs (Public, Privileged, or CEII) where you can upload your files
  - o Public is the default tab for uploads; please upload Public files first
  - o Selecting a tab will allow for files to be uploaded to it
  - o There must be at least one public file
  - o Protected material will be uploaded as Privileged
  - o The Description is optional and only serves as a reference to you
- Click Upload
  - o The file will appear under the selected security tab once uploaded
  - o Files can be re-ordered, their security edited, or removed once uploaded.
  - o A tally of total files under each security designation is provided for reference.
  - o Large Format should be selected for documents larger than 11"x17"
- Click Next once all files have been uploaded
  - o The filing time is established after you have uploaded the last file.
  - o Subsequent steps do not affect the filing time unless another file is uploaded at which point the time will be updated.

**Step 5: Specify Filing Parties**
- Enter the name of the filing party
  - o This is the party the filing pertains to, not the law firm
- Select the filing party
  - o Multiple filing parties can be selected
  - o A list of the selections will be generated
- Click Next once all parties have been selected
- Select As an Individual radio button if filing for yourself

**Step 6: Specify the Person to Whom Communications Should be Addressed**
- Enter the email address for the party
  - o All email accounts must be eRegistered
  - o Each party must have a signer
  - o Multiple Signers and Other Contacts can be added for each party



# Federal Energy Regulatory Commission
## eFiling User Guide

- o Signers and Other Contacts will be added to the Service List where applicable
- Click Next once all Signers and Other Contacts have been added

## Step 7: Submission Description
- Enter a description that best describes the filing
    - o A generic description is created based on the menu-selections in Step 1.
    - o Fully describe the filing – Note comments, protests, or other motions
    - o Testimony should include the type and person testifying
    - o Rehearing requests should include the date of the Commission or Letter Order that is subject to the request
- Click Next

## Step 8: Summary & Submission
- All information regarding the submission can be reviewed on this screen
- Click Submit once you have reviewed and verified all information as correct

## Confirmation of Receipt Email
- A receipt email is sent to the eRegistered account of the submitter
- Confirmation includes a link to information about the filing
- This email can be forwarded to those contacts that have an email address on the Service List
- If you do not receive a receipt email, contact FERC Online Support (Info Below)
- This email serves as proof that FERC has received your filing. The date/time of filing will not change regardless of when the filing is accepted
- This email does not constitute official acceptance of the filing

## Acceptance / Rejection Email
- FERC reviews each filing prior to acceptance or rejection
- Some filings require a more detailed Program Office review, which may take up to a business day depending on workload.
- The acceptance email will reflect new dockets or sub-dockets assigned.

## Help Resources
- FERC Online Support
    - o [FERCOnlineSupport@ferc.gov](mailto:FERCOnlineSupport@ferc.gov)
    - o 1-866-208-3676 (toll-free)



# Federal Energy Regulatory Commission
## eFiling User Guide

- [Acceptable File Types](#)
- [Filing Guide and Qualified Documents List](#)
- [eFiling FAQ](#)
- [Submission Guidelines](#)
- [Requirements Related to Filings & Comments](#)
- [How-To: Intervene](#)

# ATTACHMENT F

**UNITED STATES OF AMERICA**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **IN THE MATTERS OF** | ) | |
| | ) | **DOCKET NOS.** |
| **Cameron LNG, LLC** | ) | **CP13-25 & CP13-27** |
| **Cameron Interstate Pipeline, LLC** | ) | |

**Request for Rehearing and Answer to Motion to Strike**

Pursuant to Section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a), and Rule 713 of the Rules of Practice of the Federal Energy Regulatory Commission ("Commission"), 18 C.F.R. § 385.713, the Sierra Club, Gulf Restoration Network, and RESTORE ("Movants") hereby move for rehearing of the Commission's "Notice Rejecting Request For Rehearing And Dismissing Request For Stay" ("Order"), issued July 29, 2014, 148 FERC ¶ 61,073, in the above-captioned matter. The Order rejected Movants' request for rehearing of the Commission's June 19, 2014 Order as untimely, on the ground that this request was received by FERC's computer servers twenty-five seconds after 5:00 eastern time on the last day of the filing period. In this current request, Movants ask the Commission to accept that motion as timely, review it on the merits, and grant the relief requested therein.

This Request also serves as an answer to the motion to strike filed by Cameron LNG, LLC and Cameron Interstate Pipeline, LLC ("Applicants") on July 23, 2014.

All communications regarding this motion should be addressed to and served upon Nathan Matthews, Staff Attorney, and Natalie Spiegel, Legal Assistant, at Sierra Club, 85 2nd St., Second Floor, San Francisco, California 94105.

## I.    Statement of Relevant Facts

On June 19, 2014, the Commission issued an order authorizing Applicants to construct and operate various facilities in connection with a proposal to export liquefied natural gas. On July 21, 2014, Movants submitted a request for rehearing of the June 19 order. According to the Commission's servers, this request for rehearing was received at 5:00:25 p.m. Eastern Time, *i.e.*, twenty-five seconds after five o'clock. The Commission's website recognizes that this document was "first received" at this time, but the Commission determined that this document was "filed" the following day, July 22, 2014.

On July 23, 2014, Applicants submitted a motion to strike the rehearing request. Applicants argued that the motion was untimely because Commission rules provide that documents electronically filed after the Commissions' business hours, which last until 5:00 Eastern Time, will be deemed to have been filed the following business day, and Applicants contend that Movants' rehearing request was filed twenty five seconds after this deadline. Applicants further argued that Movants failed to comply with 18 C.F.R. § 385.713(c)(2), regarding the contents of requests for rehearing.

On July 29, 2014, the Commission issued a "Notice Rejecting Request For Rehearing And Dismissing Request For Stay." 148 FERC ¶ 61,073 ("Order"). This Order is the subject of Movants' instant request for rehearing.

## II.   Concise Statement of the Alleged Errors in the Order

1. *FERC rules granted movants 15 days to respond to Cameron's motion to strike movants' prior petition for rehearing, and FERC should not have granted the relief requested by Cameron until Movants had responded or this period had elapsed.* 18 C.F.R. § 385.213

2. *The Commission erred in concluding that the prior request for rehearing was filed after the time prescribed by Commission regulations, because (a) as these regulations only specify time in minutes, times should be rounded to the nearest minute,* 18 C.F.R. § 375.101(c), *and (b) the pertinent time is when the last byte of the document is uploaded, not when the remaining steps of the filing process are completed.* 18 C.F.R. § 385.2003(c)(3).

3. *The Commission erred in concluding that the Natural Gas Act prohibited the Commission from accepting Movants' prior petition for rehearing as timely.* 5 U.S.C. § 717r, 18 C.F.R. § 385.2007(a)(2). *Dayton Power & Light Co. v. Fed. Power Comm'n*, 251 F.2d 875, 877 (D.C. Cir. 1957), *Boston Gas Co. v. FERC*, 575 F.2d 975 (1st Cir. 1978). *The Commission should have exercised this authority to review Movants' petition for rehearing on the merits, in light of the truly de minimus nature of any delay*

In addition to alleging these errors in the Order, Movants answer that, contrary to the argument presented in Applicants' motion to strike but not addressed in the Order, the July 21, 2014 request for rehearing complied with the requirements of 18 C.F.R. § 385.713(c)(2).

## III.    Statement of the Issues

### A.    The Commission Erred by Granting the Relief Sought by Applicants' Motion to Strike Without Allowing Movants to Answer

On July 23, 2014, Applicants Cameron LNG, LLC and Cameron Interstate Pipeline, LLC filed a motion to strike movants' request for rehearing. Commission rules provided Movants with 15 days to answer this motion. 18 C.F.R. § 385.202 (all motions are pleadings), § 385.213(a)(3) (other than exceptions not applicable here, answers are permitted to all pleadings), § 385.213(d)(1) (answers permitted within 15 days of the filing of a pleading).

Although the Order did not directly refer to this motion to strike, the order granted the relief requested therein, on the basis argued therein. Doing so prior to the expiration of the 15 days provided by Rule 213(d)(1), and without any notice to Movants that a more prompt response would be required, infringed upon the right afforded by Rule 213 and more general principles of due process. The reasoning provided by the motion to strike rests on legal errors that we describe below. If the Commission had waited for Movants to answer, these errors would have been revealed, likely preventing the Commission's implicit adoption of Applicants' arguments.

Accordingly, the Commission should withdraw the Order and consider Applicants' motion to strike on a clean slate, informed by law and argument provided in this request for rehearing and answer. For the reasons stated below, the motion to strike should be denied.

### B.    Under the Commission's Rules, The Petition Was Timely Filed

Under a proper interpretation of the Commission's rules, Movants' rehearing request was filed by the filing deadline. The rules do not specify times in seconds, times should be rounded to the nearest minute. In addition, the rules specify that timeliness will be measured by the time the document was uploaded, rather than the time at which the remaining steps of the filing were completed.

Commission rules specify that "Unless the Chairman otherwise directs, the offices of the Commission are open each day, except Saturdays, Sundays, and Holidays, from 8:30 a.m. to 5:00 p.m." 18 C.F.R. § 375.101(c). Similarly, the Commission's "eFiling User Guide" simply states that "5:00PM EST is the filing deadline."[1] The rule does not specify a time in seconds. Accordingly, the most reasonable interpretation of this rule is to round times to the nearest

---

[1] http://www.ferc.gov/docs-filing/efiling-user-guide.pdf. We note that EST refers to Eastern Standard Time, but that daylight savings time was in effect on July 29, and is reflected in the 5:00:25 timestamp. This timestamp would be 4:00:25 in Eastern Standard, rather than Eastern Daylight, time. 15 U.S.C. §§ 260a(a), 261a(a)

minute. The Commission concluded that Movants' July 21 request for rehearing was filed at 5:00:25. Rounding to the nearest minute, this rehearing request was filed at 5:00, meeting the filing deadline.

   In addition, the pertinent rule provides that "For purposes of statutes or regulations governing timeliness, a document filed via the Internet will be deemed to have been received by the Commission at the time the last byte *of the document* is received by the Commission." 18 C.F.R. § 385.2003(c)(3) (emphasis added). As the Commission is aware, actually transmitting the document to the Commission's website is not the last step of the Commission's internet filing procedures. Instead, after every byte of the entire document is uploaded to the Commission's website, a filer must then select the filing party, add signing and non-signing contacts, provide a document description, and then review and submit the filing.  Here, Movants contend on information and belief that while these four additional steps were not completed until the Commission's clock read 5:00:25, the actual "PDF" document constituting the rehearing request had been successfully uploaded prior to 5:00:00. As explained in the attached declaration, this belief is based on the fact that movants began the efiling process well before 5:00 and the fact that it generally takes counsel for movants more than thirty seconds to complete these last four steps. Interpreting Rule 2003 literally—*i.e.*, to refer to the time the document upload step is completed, rather than the time the entire e-filing process is completed—is consistent with the Commission's stated purposes for the 5:00 e-filing requirement, such as maintaining "[]fairness to paper filers."[2] A paper filing will be accepted if the actual document has been handed to a clerk by 5:00, even if additional steps remain. Extending the same treatment to electronic filings, and thereby treating electronic filings as timely so long as the document upload step has been completed by 5:00, is both required by the language of the rule and consistent with the stated goal of putting paper and electronic filers on equal footing.

### C.    Alternatively, The Commission Can and Must Accept Movants' Petition Even If It Was Received After The Close of Business

   Alternatively, even if Movants' request for rehearing was received after the deadline set by Commission rules, in this case, the Commission had authority to accept Movants' request as timely. The Order's conclusion that the Commission lacked authority to do anything other than reject Movants' request for rehearing as untimely was mistaken as a matter of law. The Commission has authority to accept Movants' rehearing request as timely, and all equitable and policy considerations demonstrate that the Commission should do so here.

---

[2] Filing via the Internet, FERC Order 703, 121 FERC ¶ 61171, p 30-31 (Nov. 15, 2007).

### 1.    The Commission Erred in Concluding That It Lacked Authority to Accept Movants' Petition As Timely

The Order erred in concluding that the Commission was required to reject Movants' request for rehearing as untimely. The Order asserts, without citation to authority, that "Because the 30-day rehearing deadline is a statutory requirement, it cannot be waived or extended. Therefore, the request for rehearing must be rejected as untimely." Order at 2. Applicants' motion to strike cites two cases in support of this argument: *Cities of Campbell v. FERC*, 770 F.2d 1180 (D.C. Cir. 1985) (interpreting analogous provision of Federal Power Act, 16 U.S.C. § 825l(a)) and *Boston Gas Co. v. FERC*, 575 F.2d 975 (1st Cir. 1978).

As a threshold matter, we note that these cases concern delays of days, rather than seconds, in seeking rehearing. As we explain in the following section, a delay of seconds, unlike a delay of days, is plainly *de minimus*. Because the question of de minimus delay was not before these courts, their statements about rehearing requests filed days after the deadline cannot be taken to implicitly reject the Commission's authority to excuse truly de minimus delays.

Indeed, to the extent *Campbell* and *Boston Gas* apply at all, they support Movants here. Both cases conclude that the Commission's authority to extend the 30-day rehearing period is limited because Congress intended the 30-day period to be a jurisdictional limit provided by the statute. These courts' framing of the question reflects the recognized principle that agencies and courts generally have equitable powers to extend time limits unless the limit is jurisdictional. *See, e.g.*, *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1054 (D.C. Cir. 1988), *Rouse v. U.S. Dep't of State*, 567 F.3d 408, 415 (9th Cir. 2009), *Avila-Santoyo v. U.S. Atty. Gen.*, 713 F.3d 1357, 1362 (11th Cir. 2013). *Campbell* stated, in dicta, that "The 30-day time requirement of [the Federal Power Act] is as much a part of the jurisdictional threshold as the mandate to file for a rehearing," before going on to conclude that the timeliness question was irrelevant to the matter before the Court. 770 F.2d at 1183.[3] *Boston Gas* concluded that the court lacked jurisdiction to hear an appeal when the underlying rehearing request had been filed 34 days after the challenged order. 575 F.2d at 977. Accepting the appeal "would require [the Court] to strike the 30 day time limit from the statute or give the Commission the authority to extend the time limit whenever it sees fit to do so," because "petitioner ha[d] not suggested, nor [could] we perceive, a rule of general application which would permit the Commission to avoid the requirements of the thirty day time limit in this case, but would restrict it from doing so in other circumstances." *Id.* at 979. Accordingly, *Boston Gas* concluded that the Commission lacked the authority to accept the four-day-late rehearing request as timely. *Id.*

Although the statute specifies a 30-day limit, nothing in the statute compels the Commission's decision to treat filings received after business hours as filings received the following business day. Indeed, the Commission has recognized that it has authority to alter rule

---

[3] In *Campbell*, the untimely rehearing request only pertained to an order than the one actually under appeal, and there was no question that rehearing had been timely sought for the order under review.

2001(a)(2)'s provision that "Any document received after regular business hours is considered filed on the next regular business day," and that the Commission could instead accept filings as late as midnight Eastern Time.[4] The Commission has chosen not to exercise this authority and to instead set a 5:00 Eastern filing deadline, but it is clear that the Natural Gas Act does not require this earlier deadline. Because the 5:00 deadline is not a statutory requirement, as recognized by the Commission, the 5:00 deadline is not jurisdictional, and the Commission therefore has authority to relax rule 2001(a)(2) by application of ordinary principles of equity. While the Natural Gas Act might have required the Commission to treat a request actually submitted on July 22 as untimely, the Natural Gas Act did not require the Commission to treat Movants' requests, received at 5:00:25 p.m. on July 21, as submitted on July 22.

Indeed, Circuit cases have explicitly held that the Commission's rules, unlike the statute's 30-day limit, are not jurisdictional and can be waived. The DC Circuit has held that where Dayton Power and Light provided the Federal Power Commission with a copy of a rehearing petition on the final day of the rehearing period, but failed to comply with various Commission procedural rules regarding this filing until it re-submitted the filing after the close of the rehearing period, "The Commission was seasonably put on notice that Dayton sought rehearing," such that "Dayton met the command of the statute." *Dayton Power & Light Co. v. Fed. Power Comm'n*, 251 F.2d 875, 877 (D.C. Cir. 1957). The Court rejected the argument that "failure . . . to fulfill the literal procedural requirement of the quoted [Commission] Rule is, as a matter of law, a fatal jurisdictional defect," explaining instead that "we cannot hold the failure to meet the directive of this procedural rule is jurisdictional." *Id.* The Court reversed the Commission's rejection of the request as untimely and remanded to the Commission for review of the request on the merits. *Id.* Similarly, Courts have held that the Commission has authority to deem the rehearing request requirement satisfied by a simple telegram styled as a protest, rather than a rehearing request, that the Commission received within the rehearing period, despite the telegram's apparent failure to style itself as a request for rehearing or to comply with the requirements applicable thereto. *Natural Gas Pipeline Co. v. Fed. Power Comm'n*, 253 F.2d 3, 7, 8 (3d Cir. 1958).

Moreover, the Commission can even extend the statute's 30 day period where the Commission provides the kind of rule *Boston Gas* found lacking, *i.e.*, a "rule of general application which would permit the Commission to avoid the requirements of the thirty day time limit in [particular] case[s], but would restrict it from doing so in other circumstances." The Commission already claims authority to accept rehearing requests filed after the 30 day period when the period expires on a weekend or holiday. 18 C.F.R. § 385.2007(a)(2). The D.C. Circuit has consistently affirmed the Commission's authority to extend the jurisdictional 30 day limit in this circumstance. *Corning Glass Works v. FERC,* 675 F.2d 392, 396 n.12 (D.C. Cir. 1982); *Cities of Batavia v. FERC,* 672 F.2d 64, 72-73 (D.C. Cir. 1982). The rule extending the rehearing period to the next business day plainly comports with the policy concerns identified in *Boston*

---

[4] Filing via the Internet, FERC Order 703, 121 FERC ¶ 61171, p 30-31 (Nov. 15, 2007).

*Gas*; it is sufficiently limited to avoid intruding upon "the statutory right to be free from prolonged uncertainty resulting from delayed efforts to resolve an issue," and does not grant the Commission the authority to exercise "unguided discretion." 575 F.2d at 979.

The Natural Gas Act requires that requests for rehearing be filed within 30 days of a Commission Order, but is silent as to when on the 30th day rehearing requests must be received. Circuit court authority holds that Commission rules not rooted in statutory requirements, such as the rule treating applications filed after the close of business as filed the following day, are non-jurisdictional. Because these rules are non-jurisdictional, the Commission has authority to excuse a failure to comply with the letter of these rules pursuant to ordinary principles of equity. Exercising authority to accept requests for rehearing filed after the close of business on the last day of the filing period does not require striking the 30 day limit from the Natural Gas Act and is consistent with the purposes of the Act.

### 2.     Pursuant to This Authority, The Commission Should Have Accepted Movants' Petition As Timely and Evaluated It on Its Merits

The Order concluded that the Commission lacked authority to accept Movants' request for rehearing, and therefore did not address the question of whether, if the Commission had that authority, it would be appropriate to do so. As explained above, the Commission's interpretation of its own authority was mistaken. Given that the Commission has authority to accept rehearing requests filed after the close of business on the last day of the rehearing period, in this case, the only reasonable exercise of this authority is to accept Movants' request and review it on the merits.

Movants here represent public interests in environmental protection and public health, rather than private interests. Movants' request for rehearing raises important questions about the impact of proposed liquefied natural gas export projects, including agency review thereof. One demonstration of the importance of these issues is the fact the Department of Energy recently published extensive supplementary environmental analysis on these issues, and more than 40,000 members of the public submitted comments thereon.[5] The Cameron projects are important both individually and as an indicator of how the Commission will proceed with the many other liquefied natural gas project currently awaiting Commission review. As such, there is a strong public interest in careful review of these issues.

On the other hand, neither Applicants nor the Commission have identified any harm or prejudice that would result from accepting Movants' rehearing request as timely, nor could there be any such prejudice. As we explain above, the delay of less than thirty seconds can and should literally be rounded off and ignored. But even if FERC interprets its regulations to require completion of the e-filing process by 5:00:00, it is clear that the additional twenty five seconds in this case did not have any adverse impact. They did not delay any party's receipt of the rehearing

---

[5] *See* http://energy.gov/fe/doe-lng-exports-announcements-may-29-2014.

request, because, pursuant to Commission rules, Movants served all parties directly at 5:13 p.m. Eastern Time on July 21, 2014. These twenty-five seconds do not create any "prolonged uncertainty" or preclude "prompt resolution of Commission affairs." *Boston Gas*, 575 F.2d at 979. Instead, the Commission and parties were "seasonably put on notice" that Movants had requested rehearing, and of the basis for this request. *Dayton Power & Light*, 251 F.2d at 877.

In light of the utter lack of harm or prejudice arising from a 25 second delay, the only reasonable course of action is for the Commission to review Movants' request for rehearing on the merits. *C.f. Superior Offshore Pipeline Co.*, 68 FERC ¶ 61089 (July 19, 1994) (lack of prejudice to other parties is, in and of itself, basis for accepting motion to intervene filed out of time); *E. Am. Energy Corp. Columbia Gas Transmission Corp.*, 68 FERC ¶ 61087 (July 19, 1994); *Am. Ref-Fuel Co. of Hempstead*, 47 FERC ¶ 61161 (Apr. 28, 1989).[6]

### D.    The July 21, 2014 Request for Rehearing Complied with 18 C.F.R. § 385.713(c)(2)

Applicants' motion to strike mistakenly argues that "The request for rehearing fails to cite to any precedent or legal authority in its statement of errors." 18 C.F.R. § 385.713(c) imposes two distinct requirements. Section 385.713(c)(1) requires that the request for rehearing "state concisely the alleged error." The July 21 rehearing request complied with this in part II, "Concise Statement of the Alleged Errors in the Order." Section 385.713(c)(2) separately requires a "Statement of Issues," discussing the issues individually and providing citations to supporting authority. Movants provided this in part III of the request for rehearing, with individual organized in subsections A through D and, where appropriate, included subsections.

## IV.    Conclusion

Based on the foregoing, Movants respectfully request that the Commission grant this request for rehearing and rescission of the Order, that the Commission review Movants' July 21, 2014 request for rehearing on the merits, and that the Commission grant that request.

Dated: August 7, 2014                                    Respectfully submitted,

---

[6] Insofar as an additional showing of good cause is additional required, Movants note that comments on the DOE LNG export environmental review materials, mentioned above, were due at 4:30 Eastern Time on July 21, 2014, and considered many overlapping issues. Because the Commission has refused to address the environmental impacts of liquefied natural gas exports programmatically or in a similar consolidated way, and because these DOE materials are DOE's first effort at systematic treatment, Movants (non-profit public interest organizations with limited resources) have faced a burden in participating the two agencies' overlapping and fragmented review of environmental impacts.

/s/Nathan Matthews
Nathan Matthews
Sierra Club Environmental Law Program
85 2nd St., Second Floor
San Francisco, CA 94105

Counsel for:
Sierra Club
Gulf Restoration Network
RESTORE

9

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| IN THE MATTERS OF | ) | |
| | ) | **DOCKET NOS.** |
| **Cameron LNG, LLC** | ) | **CP13-25 & CP13-27** |
| **Cameron Interstate Pipeline, LLC** | ) | |

### Declaration of Nathan Matthews

1. I am a Staff Attorney with the Sierra Club's Environmental Law Program located at 85 Second Street, 2nd Floor, San Francisco, CA 94105. I have held this position for three years. I submit this Declaration in support of the Request for Rehearing and Answer to Motion to Strike submitted by Sierra Club, Gulf Restoration Network, and RESTORE.

2. On July 21, 2014, I filed a request for rehearing in the above-captioned dockets.

3. I was assisted by Sierra Club legal assistant Natalie Spiegel, who was working under my direct supervision. Ms. Spiegel has assisted me with other filings in this docket as well as filings in other FERC dockets.

4. Our office is located in San Francisco, California, and we work under Pacific Time.

5. As the first step in filing this rehearing petition, we opened the e-filing website, http://ferc.gov/docs-filing/efiling.asp, and logged in under my credentials well before 2:00 p.m. Pacific Time on July 21, 2014.

6. The second step of the efiling process is selection of the type of filing. We completed this step well in advance of 2:00 p.m. Pacific Time.

7. The third step of this process is selection of the particular dockets in which documents will be filed. Again, we completed this step well in advance of 2:00 p.m. Pacific Time.

8. The fourth step is selection of one or more files to upload, and uploading of these files. We began this step prior to 2:00 p.m. Pacific Time.

9. I did not check or make note of the time at which this step was completed, nor did Ms Spiegel.

10. I nonetheless believe that the document was fully uploaded prior to 2:00:00 p.m. Pacific Time on July 21, 2014. I base this belief off the fact that there were four additional steps that we completed before the e-filing was submitted, the fact that according to the efiling website, the entire process was completed at 2:00:25 Pacific Time, and my experience with completing these four additional steps in other filings, as it generally takes at least thirty seconds for me, Ms. Spiegel, or the two of us together to complete these steps.

11. I have reviewed the above with Ms. Spiegel, and she informed me that she agrees with these statements. Ms. Spiegel has been out of the office since July 28 on vacation followed by an unexpected family health emergency, and has therefore been unable to provide her own declaration in this matter.

12. I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 7th day of August, 2014.

Nathan Matthews

2

**Certificate of Service**

I hereby certify that I have this day served the foregoing document upon each

person designated on the official service list compiled by the Secretary in this

proceeding.

Dated at San Francisco, CA this 7th day of August, 2014.


<u>/s/Nathan Matthews</u>
Nathan Matthews
Sierra Club Environmental Law Program
85 2nd St., Second Floor
San Francisco, CA 94105

USCA Case #14-1190          Document #1525844          Filed: 12/05/2014          Page 101 of 102

Document Content(s)

Cameron rehearing Aug 7. FINAL.PDF....................................1-9

Matthews decl. signed.PDF...........................................10-11

Certificate of service.PDF..........................................12-12

# CERTIFICATE OF SERVICE

I, Kadie McShirley, hereby certify under the penalty of perjury that on December 5, 2014, I filed the original of Petitioners' Opposition to Respondent's Motion for Summary Affirmance in Part and Dismissal in Remaining Part via the Court's CM/ECF system, thereby causing an electronic copy to be served on all parties registered to receive notices in this case via electronic noticing. I further certify that I mailed a copy of the foregoing via U.S. Mail, first-class postage prepaid, to the following:

Mark Richard Haskell
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541

December 5, 2014                    /s/ Kadie McShirley

                                   Kadie McShirley
                                   Sierra Club
                                   85 Second St., 2d Fl.
                                   San Francisco, CA 94105